# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

E. & J. GALLO WINERY,
           *Plaintiff-Appellee,*

v.

ENCANA CORPORATION, formerly
known as PANCANADIAN ENERGY
CORPORATION; WD ENERGY
SERVICES INC., formerly known as
ENCANA ENERGY SERVICES,
           *Defendants-Appellants.*

No. 05-17352

D.C. No.
CV-03-05412-AWI

OPINION

Appeal from the United States District Court
for the Eastern District of California
Anthony W. Ishii, District Judge, Presiding

Argued and Submitted
February 13, 2007—San Francisco, California

Filed September 19, 2007

Before: Betty B. Fletcher, Richard R. Clifton, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta

12523

**COUNSEL**

Richard P. Levy, David A. Battaglia, James P. Fogelman, Julian W. Poon and J. Christopher Jennings, Gibson, Dunn & Crutcher, LLP, Los Angeles, California, for defendant-appellant EnCana Corporation formerly known as Pan-Canadian Energy Corporation; WD Energy Services, Inc., formerly known as EnCana Energy Services.

Joseph W. Cotchett, Frank M. Pitre, Steven N. Williams, and Barbara L. Lyons, Cotchett, Pitre, Simon & McCarthy, Burlingame, California; D. Greg Durbin and Timothy J. Buchanan, McCormick, Barstow, Sheppard, Wayte & Carruth, LLP, Fresno, California; G. Kip Edwards, Kings Beach, California, for plaintiff-appellee E. & J. Gallo Winery.

**OPINION**

IKUTA, Circuit Judge:

E. & J. Gallo Winery ("Gallo") alleged that EnCana Corp., a natural gas supplier, and WD Energy Services, Inc., a wholly-owned marketing subsidiary of EnCana Corp. (collectively "EnCana"), along with multiple unnamed coconspirators, inflated the price Gallo paid for natural gas through their violations of state and federal antitrust laws. EnCana sought summary judgment on the ground that the filed rate doctrine and federal preemption bar Gallo's claims as a matter of law. The district court denied EnCana's summary judgment motion. We have jurisdiction over this interlocutory appeal pursuant to 28 U.S.C. § 1292(b), and we now affirm the district court.

# I

## GALLO'S CLAIMS AND PROCEDURAL HISTORY

Gallo is a wine producer and distributor headquartered in California that purchased natural gas for use in its wineries and glass plant. During the period between June 1, 2000, and December 31, 2001, Gallo purchased its gas at the California border market known as PG&E Citygate from EnCana, an energy trader.[1] During this period, the purchase and sale contract between Gallo and EnCana did not specify how the parties would calculate the price of the natural gas. However, both parties concede that, as a matter of practice, the purchase price was pegged to indices published in two trade publications, *Natural Gas Intelligence* ("*NGI*") and *Gas Daily*.

Beginning in the summer of 2000, both natural gas and electricity prices at the California border markets were subject to widespread manipulation by energy traders that dramatically raised the price of natural gas. *See* Final Report on Price Manipulation in Western Markets ("Final Report"), Federal Energy Regulatory Commission (2003). One of the key elements of the market misconduct was the manipulation of prices reported to private indices published by natural gas trade publications. These indices, including *NGI* and *Gas Daily*, reported the sales price for wholesale transactions at market rates. As explained by the district court:

> The indices published in the *NGI* or the *Gas Daily Index* are closely linked to rates, but are not rates themselves. The published index represents a compilation of submitted and verified information gathered from voluntary submissions of trading activity and is published as a price representing trading activity at each location.

[1] Natural gas is transported from producing basins in the Western and Central portion of the United States and Canada into California at four different border pipeline points called "Citygates."

*E. & J. Gallo Winery v. EnCana Corp.*, No. CV-F-03-5412 #AWI-LJO, 2005 WL 2435900 at *19 (E.D. Cal. Sept. 30, 2005) (memorandum order and opinion denying defendant's motion for summary judgement).

Buyers and sellers relied on these indices to determine the market price for natural gas transactions. *See* Final Report, at III-17. However, there was neither a formal process for reporting pricing data to the publishers of the indices, nor any oversight by the Federal Energy Regulatory Commission ("FERC"), which has jurisdiction over certain natural gas wholesale transactions. *See E. & J. Gallo Winery*, 2005 WL 2435900, at *19. The process by which the prices in natural gas transactions were reported to the publishers of indices was left largely to the traders themselves. After investigating the operation of the indices, FERC explained that:

> [M]ost of the largest natural gas marketing companies in the country had no formal process for reporting trade data to the publishers of the price indices; the process was left to the trading desks and the traders themselves. Traders from all companies describe a typical trading day as hectic, pressure packed, and frenetic. One of their many tasks was to report trading data to the Trade Press; this was viewed as bothersome but necessary. Often it was a job given to the newest employee. Many companies report passing around a form or using a spreadsheet on a shared drive. The last person who filled out the form or spreadsheet may have been required to total the numbers and send them to the Trade Press. There was nothing to stop a trader from changing the numbers someone else had entered. In other cases, traders took an oral "survey" to get a sense of where the market was trading. Sometimes they represented it to the Trade Press as an actual survey, but in other cases they made up trades to average out to a number that was consistent with this "survey."

Final Report, at III-29. Thus, despite their wide use as reference points in pricing natural gas sales and derivatives, including most of the transactions subject to FERC's jurisdictional authority, the information used to calculate the indices was reported in a less than meticulous manner. Not only were the indices ripe for manipulation, but also FERC's investigation confirmed that such abuse actually occurred. Market participants had provided false reports of natural gas prices and trade volumes, and had engaged in other misconduct. *Id.* at ES-1-ES-6.

As a purchaser in the wholesale market, Gallo alleges it was affected by the widespread price manipulation identified by FERC in such markets. Specifically, Gallo claims that EnCana and its competitors engaged in a number of illegal practices designed to manipulate the indices, including agreeing to set the "basis"[2] price of natural gas at an inflated rate, misreporting natural gas prices paid to the indices, and engaging in "wash trades."[3] Because Gallo paid EnCana for natural gas at rates pegged to the indices, Gallo claims it was injured by the illegal practices that artificially inflated the indices. Gallo seeks to recover as damages the amount it was overcharged due to the allegedly illegal conduct. Gallo states it can establish its damages by determining a hypothetical fair index price and then subtracting that price from the actual price Gallo paid for natural gas.

On April 9, 2003, Gallo filed a six-count complaint against EnCana, consisting of federal and state antitrust actions and state law damage claims arising under various statutes: the

---

[2]Basis is the difference between the commodity price of natural gas as quoted on the New York Mercantile Exchange and the price paid for natural gas at the California border. Thus, basis generally reflects the cost of transportation.

[3]A wash trade is a transaction where two parties simultaneously buy and sell the same quantity of natural gas at the same price and on the same day. This creates a false appearance of demand for and short supply of natural gas.

Sherman Act, 15 U.S.C. § 1, California's Cartwright Act, CAL. BUS. & PROF. CODE §§ 16720 *et seq.*, California's Unfair Competition Law, CAL. BUS. & PROF. CODE §§17200 *et seq.*, California's Uniform Fraudulent Transfer Act, CAL. CIV. CODE §§ 3439 *et seq.,* and under a theory of unjust enrichment. Gallo sought treble damages, disgorgement or restitution, and injunctive relief, as well as a constructive trust for fraudulently transferred assets.

On February 11, 2004, EnCana moved to dismiss the complaint on the grounds that, among other things, the filed rate doctrine barred all of Gallo's federal claims and that federal preemption barred Gallo's state law claims. The district court denied the motion because it determined that Gallo—given its status as a retail purchaser for consumption—might be able to prove its damages in a way that would not impinge on FERC's authority over wholesale rates. After Gallo filed an amended complaint, EnCana filed a second motion to dismiss, which was also denied. Then, on July 25, 2005, EnCana moved for summary judgment, contending that Gallo's damage claims are barred because they require a court to determine a hypothetical fair rate in the wholesale natural gas market, a determination barred by the filed rate doctrine and associated principles of federal preemption. The district court denied this motion, holding that Gallo could prove its damages without requiring the court "to examine the fairness of a rate or tariff that has been filed by FERC." *E. & J. Gallo Winery*, 2005 WL 2435900, at \*23. However, the district court certified its order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) because the applicability of the filed rate doctrine is a controlling question of law in this case, and it stayed the mandate pending this court's decision on this issue. On October 24, 2005, EnCana filed a timely petition for interlocutory review, which we granted on December 8, 2005.

## II

## STANDARD OF REVIEW

We review de novo the district court's denial of summary judgment. *See Lee v. Gregory*, 363 F.3d 931, 932 (9th Cir. 2004). Summary judgment is appropriate only where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Therefore, this court must "determine, viewing the evidence in the light most favorable to the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1131-32 (9th Cir. 2003), *cert. denied*, 540 U.S. 983 (2003). We also review de novo the district court's analysis of preemption and the filed rate doctrine. *See Cal. ex rel. Lockyer v. Dynegy, Inc.,* 375 F.3d 831, 849 n.16 (9th Cir. 2004).

## III

## ANALYSIS

Gallo's damage claims are based on the theory that the rates it paid EnCana were unfairly high because they were pegged to indices that were artificially inflated due to illegal practices. EnCana argues that Gallo is challenging market-based rates that were authorized by FERC, and thus Gallo's claims are barred by two legal principles: the filed rate doctrine and associated principles of federal preemption. We start by explaining these legal principles, which are central to our analysis.

A

The Filed Rate Doctrine

**[1]** The filed rate doctrine and associated principles of federal preemption bar challenges under state law and federal antitrust laws to rates set by federal agencies. *See Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*, 295 F.3d 918, 929 (9th Cir. 2002) ("[S]tate law, and some federal law (e.g. antitrust law), may not be used to invalidate a filed rate nor to assume a rate would be charged other than the rate adopted by the federal agency in question."). The doctrine is a judicial creation that arises from decisions interpreting federal statutes that give federal agencies exclusive jurisdiction to set rates for specified utilities, originally through rate-setting procedures involving the filing of rates with the agencies. The filed rate doctrine was first applied to rates filed with the Interstate Commerce Commission under the Interstate Commerce Act, *see Keogh v. Chicago & Nw. Ry. Co.*, 260 U.S. 156 (1922), and was subsequently extended to the Natural Gas Act, ch. 556, 52 Stat. 821 (codified as amended at 15 U.S.C. §§ 717-717w) ("NGA"), *see Ark. La. Gas Co. v. Hall ("Arkla")*, 453 U.S. 571, 576-77 (1981), the Federal Power Act, *see Nantahala Power and Light Co. v. Thornburg*, 476 U.S. 953 (1986), and the Communications Act, *see AT&T v. Cent. Office Tel., Inc.*, 524 U.S. 214 (1998), among others.

In its first delineation of the filed rate doctrine, the Supreme Court held in *Keogh* that a plaintiff could not recover for damages caused by paying transportation rates that had been allegedly set in violation of the Sherman Act, because the rates had been filed with and approved by the Interstate Commerce Commission ("ICC"). *Keogh*, 260 U.S. 156. The Sherman Act permits any person who is "injured in his business or property by reason of anything forbidden in the antitrust laws" to "recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). The Court held that a plaintiff

could not be "injured in his business or property" for purposes of the Sherman Act by paying rates that had been approved by the ICC and were thus the legal rates. *Keogh*, 260 U.S. at 163 (quoting 15 U.S.C. § 15(a)). The Court noted that "[i]njury implies violation of a legal right," *id.*, and that a lawful rate could not cause such a violation.

When the Court revisited *Keogh* sixty-two years later, it reaffirmed that *Keogh's* interpretation of "injury" under section 15 of the Sherman Act precluded an award based on lawful rates approved by the ICC. *See Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409 (1986). The Court noted that "*Keogh* represents a longstanding statutory construction that Congress has consistently refused to disturb, even when revisiting this specific area of law." *Id.* at 421-22.

The logic underlying the Court's statutory construction in *Keogh* is equally applicable to the NGA, which provides the framework for federal regulation of the natural gas industry. *Arkla*, 453 U.S. at 577; *see also Fed. Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 609-11 (1944). Section 4 of the NGA provides that rates in natural gas transactions subject to the NGA's scope[4] "shall be just and reasonable." 15 U.S.C. § 717c(a). Section 4 also provides that natural gas companies must file their rates for transportation or sale with the Federal Power Commission (now FERC) and allows FERC to hold hearings to determine the lawfulness of the rates. 15 U.S.C. § 717c(e). In finding a rate just and reasonable, FERC conclusively determines that the rate is lawful for transactions subject to its jurisdiction under the NGA. As a result, "[n]o court may substitute its own judgment on reasonableness for the judgment of [FERC]. The authority to decide whether the

---

[4]Section 1(b) of the NGA, 15 U.S.C. § 717(b), established that the NGA applies "to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale."

rates are reasonable is vested by [section] 4 of the [NGA] solely in [FERC], and the right to a reasonable rate is the right to the rate which [FERC] files or fixes." *Arkla*, 453 U.S. at 577 (internal citations and quotation marks omitted).

Consistent with the logic of the filed rate doctrine, the Supreme Court determined that the Supremacy Clause precludes a state court from awarding damages that, in effect, give the plaintiff a rate different from the rate filed with and approved by a federal agency. *See id.* at 580. In the leading case of *Arkla*, a purchase contract between Arkla and certain gas producers included a "favored nations clause" providing that if Arkla paid more for gas from some other seller, Arkla would also pay the producers that higher price. *Id.* at 573. The contract rates were filed with and approved by FERC (or its predecessor agency). *Id.* at 574. After Arkla allegedly began paying higher rates to another provider of natural gas, the gas producers brought an action against Arkla claiming a breach of the "favored nations clause." *Id.* The state supreme court awarded the producers damages. *Id.* at 575.

The Supreme Court reversed this judgment, holding that the NGA barred the producers "from collecting a rate other than the one filed with [FERC]." *Id.* at 578. FERC's determination of the lawful rate preempted any conflicting state determination, and thus the Supremacy Clause precluded a state court from using a breach-of-contract action to grant producers a rate higher than FERC allowed. *Id.* at 583-84. By awarding damages, the state supreme court had "usurped a function that Congress has assigned to a federal regulatory body," which "the Supremacy Clause will not permit." *Id.* at 582. Put succinctly, "[w]hen the filed rate doctrine applies to state regulators, it does so as a matter of federal pre-emption through the Supremacy Clause." *Entergy La., Inc. v. La. Pub. Serv. Comm'n*, 539 U.S. 39, 47 (2003).

**[2]** From the foregoing review of the filed rate doctrine and associated principles of federal preemption, we can derive the

following principle: to the extent Congress has given FERC authority to set rates under the NGA and FERC has exercised that authority, such rates are just and reasonable as a matter of law and cannot be collaterally challenged under federal antitrust law or state law. For convenience, we will refer to such just and reasonable rates as "FERC-authorized rates." We will refer to the statutory interpretation of the Sherman Antitrust Act that bars federal antitrust challenges to FERC-authorized rates and the preemption analysis set forth in *Arkla* that bars state law challenges collectively as the "Filed Rate Doctrine."

B

FERC-Authorized Rates and the Indices

The underlying issue in this appeal is whether Gallo is challenging FERC-authorized rates. If so, Gallo's claims would be barred by the Filed Rate Doctrine and EnCana would be entitled to summary judgment.

This issue requires the analysis of several factors. First, because FERC no longer authorizes rates through a formal rate-filing mechanism, we must determine whether market-based rates can be FERC-authorized rates. This determination requires consideration of the significant changes in the natural gas regulatory regime from the time the Supreme Court decided *Keogh* and *Arkla* to the present.

Second, Gallo paid EnCana retail rates pegged to indices that reflected the wholesale market in natural gas. We must consider whether the Filed Rate Doctrine can bar damage claims based on an index that represents market-based wholesale rates, but that is not a rate itself. We must also consider whether Gallo's damage claims can be barred by the Filed Rate Doctrine when Gallo's purchases were retail purchases, which are outside of FERC's jurisdiction.

In analyzing these issues, we must be mindful that under the summary judgment standard, we view the evidence in the light most favorable to Gallo, the non-moving party.

*Transition from Filed Rates to Market-Based Rates.* As explained above, courts originally developed the Filed Rate Doctrine in light of FERC's exclusive jurisdiction to set rates through a rate filing procedure. *See Arkla*, 453 U.S. at 576-77. We briefly review the changes in FERC's natural gas jurisdiction and rate-setting procedure to provide the context for determining whether market-based rates can be FERC-authorized rates.

Congress originally gave FERC rate-setting jurisdiction over certain segments of the natural gas market to address concerns about monopolization in the natural gas market. Before Congress enacted the NGA, the natural gas market consisted of three segments: producers, interstate pipelines, and local distribution companies. Producers drilled for the natural gas at the wellhead and then sold the gas to interstate pipelines. Interstate pipelines then transported the gas to various locations throughout the country where it was purchased by local distribution companies, who, in turn, sold the natural gas to consumers. As a result of their control over the transportation of natural gas, interstate pipelines developed monopoly power over both purchases of natural gas at the wellhead and sales to local distribution companies. *General Motors Corp. v. Tracy*, 519 U.S. 278, 283 (1997).

In order to curb the market power of interstate pipelines, Congress passed the NGA. By its terms, the NGA is applicable to: "(1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale [i.e., wholesale sales]; and (3) natural gas companies[5] engaged in

---

[5]A "natural-gas company" is defined as "a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale." 15 U.S.C. § 717a(6).

such transportation or sale." *Panhandle E. Pipe Line Co. v. Pub. Serv. Comm'n of Ind.*, 332 U.S. 507, 516 (1947) (footnote added). The NGA is expressly inapplicable to "any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas." 15 U.S.C. § 717(b).[6] The Supreme Court confirmed that this statutory language excluded retail sales. *See Panhandle E. Pipe Line Co.*, 332 U.S. at 517 ("The line of the statute [is] thus clear and complete. It cut[s] sharply and cleanly between sales for resale and direct sales for consumptive uses."). However, the language included sales by gas producers at the wellhead. *See Phillips Petrol. Co. v. Wisconsin*, 347 U.S. 672 (1954) (interpreting the NGA definition of natural gas companies to include independent gas producers at the wellhead). As a result, during this period FERC's rate-setting jurisdiction reached sales by producers at the wellhead and sales by interstate pipelines, but not sales by local distribution companies to consumers (i.e., retail sales). *See E. & J. Gallo Winery*, No. 2005 WL 2435900, at *3. FERC exercised its rate-setting jurisdiction through the statutory filed-rate mechanism previously discussed.

As a result of an overburdened federal regulatory system and low price ceilings on wellhead sales imposed by FERC, there were acute shortages of natural gas during the 1970s. To

---

[6]15 U.S.C. § 717(b) provides:

Transactions to which provisions of chapter applicable

The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale . . . but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

ameliorate the shortages, Congress began the process of deregulating much of the natural gas industry, beginning in 1978 with the passage of the Natural Gas Policy Act ("NGPA"), Pub. L. No. 95-621, 92 Stat. 3352 (codified as amended at 15 U.S.C. §§ 3301-3432 (1994)). The NGPA eliminated the low price ceilings on wellhead sales, replacing them with maximum price ceilings for wellhead sales of natural gas that would encourage natural gas production. *Id.*

In 1989, Congress passed the Natural Gas Wellhead Decontrol Act of 1989 ("WDA"), Pub. L. No. 101-60, 103 Stat. 157, which completely eliminated FERC's authority to set prices at the wellhead by removing "first sales" from FERC's rate-setting jurisdiction.[7] Despite the complexity of the statutory definition of first sales,[8] first sales are, in

---

[7]15 U.S.C. § 3431(a)(1)(A) provides:

> For purposes of section 1(b) of the Natural Gas Act [15 U.S.C. § 717 (b)], the provisions of the Natural Gas Act [15 U.S.C. § 717 et seq.], and the jurisdiction of the Commission under such Act shall not apply to any natural gas solely by reason of any first sale of such natural gas.

[8]15 U.S.C. § 3301(21) defines "first sale" as follows:

> (A)   General rule
>
> The term "first sale" means any sale of any volume of natural gas—
>
>> (i)   to any interstate pipeline or intrastate pipeline;
>>
>> (ii)   to any local distribution company;
>>
>> (iii)   to any person for use by such person;
>>
>> (iv)   which precedes any sale described in clauses (i), (ii), or (iii); and
>>
>> (v)   which precedes or follows any sale described in clauses (i), (ii), (iii), or (iv) and is defined by the Commission as a first sale in order to prevent circumvention of any maximum lawful price established under this chapter.
>
> (B)   Certain sales not included
>
> Clauses (i), (ii), (iii), or (iv) of subparagraph (A) shall not include the sale of any volume of natural gas by any interstate pipeline,

essence, merely sales of natural gas that are not preceded by a sale to an interstate pipeline, intrastate pipeline, local distribution company, or retail customer. In other words, sales by pipelines, local distribution companies, and their affiliates cannot be first sales unless these entities are selling gas of their own production. § 3301(21)(B). Additionally, to give effect to the North American Free Trade Agreement, on October 24, 1992, Congress amended the NGA to provide that all sales of Canadian and Mexican natural gas are also first sales. Energy Policy Act of 1992, Pub. L. No. 102-486, 106 Stat. 2866 (codified at 15 U.S.C. § 717b(b)[9]). Congress's decision to remove FERC's authority to set prices for first sales left the determination of natural gas prices at the wellhead to market forces. *See* Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, 50 Fed. Reg. 42,408, 42,412 (Oct. 18, 1985).

Although the WDA's elimination of low price ceilings encouraged a more competitive market at the wellhead, pipeline companies continued to "bundle" their transportation service with their own natural gas sales and require customers to purchase both. Because consumers lacked the means of trans-

intrastate pipeline, or local distribution company, or any affiliate thereof, unless such sale is attributable to volumes of natural gas produced by such interstate pipeline, intrastate pipeline, or local distribution company, or any affiliate thereof.

[9]15 U.S.C. § 717b(b) provides:

With respect to natural gas which is imported into the United States from a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas, and with respect to liquefied natural gas—

(1)   the importation of such natural gas shall be treated as a "first sale" within the meaning of section 3301(21) of this title; and

(2)   the Commission shall not, on the basis of national origin, treat any such imported natural gas on an unjust, unreasonable, unduly discriminatory, or preferential basis.

porting the gas to their facilities, consumers could not benefit from the more competitive market at the wellhead. *See E. & J. Gallo Winery*, 2005 WL 2435900, at *3.

To further the deregulation process started by Congress, FERC began its own process of deregulating the natural gas market by giving consumers more access to wellhead markets and by moving toward market-based rates. In 1992 FERC promulgated Order 636, "which required all interstate pipelines to 'unbundle' their transportation from their own natural gas sales and to provide common carriage services to buyers from other sources that wished to ship gas [in their pipelines]." *General Motors*, 519 U.S. at 284; *see also* Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation; and Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, 57 Fed. Reg. 13,267 (April 16, 1992). As a result of Order 636 (which limited the monopoly power of the pipelines), consumers could purchase natural gas at the wellhead in an unregulated first sale and then arrange to transport the natural gas via the interstate pipelines, paying separately for the product (natural gas) and the service (transportation). In addition, FERC issued blanket sale certificates to interstate pipelines that allowed them to sell unbundled natural gas at market-based rates rather than at rates filed with FERC. 57 Fed. Reg. at 13,270.

Following Order 636, FERC continued the deregulation of rates for the transactions that remained subject to its jurisdiction. After determining that no seller of natural gas could obtain market power and that market-based rates would be "just and reasonable," *see id.* at 13,296-97; *see also* Regulations Governing Blanket Marketer Sales Certificates, 57 Fed. Reg. 57,952, 57,957-58 (Dec. 8, 1992), FERC issued blanket certificates for sales for resale of natural gas to all persons except interstate pipelines.[10] This resulted in the suspension of

---

[10]Interstate pipelines already had blanket market certificates under FERC Order 636. *See* 57 Fed. Reg. at 13,270.

FERC's rate-filing requirements for such sales. 57 Fed. Reg. at 57,953. These blanket certificates allowed all natural-gas companies subject to FERC's jurisdiction to charge rates for gas determined by market demand and freed the blanket certificate holders from "other regulation under the Natural Gas Act jurisdiction of [FERC]." 18 C.F.R. § 284.402(a). However, FERC advised the regulated natural gas industry that it would continue to "monitor the operation of the market through the complaint process." 57 Fed. Reg. at 57,958. This ongoing monitoring resulted in FERC's exercising its oversight authority in 2003, when it revoked Enron's blanket market certificate. *See Enron Power Mktg., Inc.*, 103 F.E.R.C. ¶ 61, 343, ¶ 68 (2003). In further exercise of its oversight authority, FERC subsequently amended its blanket market certificates to explicitly prohibit anticompetitive behavior and other market abuses, based on FERC's determination that price manipulation had occurred in prior years. Amendments to Blanket Sales Certificates, 68 Fed. Reg. 66,323 (Nov. 26, 2003).

In sum, the actions of Congress and FERC have effected a substantial deregulation of the natural gas market from the mid-1990s to the present. Since the mid-1990s, Congress has limited FERC's jurisdiction over wholesale sales to those wholesale sales (not including sales of Canadian and Mexican natural gas) that are preceded by a sale to an interstate pipeline, intrastate pipeline, local distribution company, or retail customer. *See* 68 Fed. Reg. at 66,324-25. A market in which retail consumers such as Gallo can participate has replaced the original wholesale market (interstate pipelines under FERC's jurisdiction buying natural gas from producers and selling it at filed rates to local distribution companies). Finally, FERC replaced filed rates with market-based rates.

*FERC's Authorization of Market Rates.* Within this historical context, we turn to the question whether FERC's authorization of market rates for certain wholesale natural gas transactions bars damage actions based on those rates to the

same extent as FERC's authorization of filed rates barred claims based on those rates. Gallo contends that only rates that have been literally filed with and approved by FERC pursuant to 15 U.S.C. § 717c(c) can bar damage claims by plaintiffs. We disagree.

**[3]** As we previously noted, the Filed Rate Doctrine is based on the principle that rates authorized by FERC are just and reasonable as a matter of law and accordingly cannot be the basis of a damage action. We have held that this principle can apply to market-based rates. *See Pub. Util. Dist. No. 1 of Grays Harbor County Wash. v. IDACORP Inc. ("Grays Harbor")*, 379 F.3d 641, 651 (9th Cir. 2004) ("[W]hile market-based rates may not have historically been the type of rate envisioned by the filed rate doctrine, we conclude that they do not fall outside of the purview of the doctrine."); *PUD No. 1 of Snohomish County v. Dynegy Power Mktg, Inc. ("Snohomish")*, 384 F.3d 756, 761 (9th cir. 2004) ("This court has rejected Snohomish's argument that the preemption-related doctrines at issue do not apply when market-based rates are involved."). Although historically FERC set rates through the statutory filed rate mechanism, the NGA does not require FERC to use any particular form of regulation in its quest to ensure reasonable rates. Rather, it has wide latitude to determine the most effective way to carry out its charge from Congress. *See Mobil Oil Exploration and Producing Se. Inc. v. United Distribution Cos.*, 498 U.S. 211, 224 (1991) ("The Court has repeatedly held that the just and reasonable standard does not compel [FERC] to use any single pricing formula . . . ."). Gallo does not contend that FERC's decision to issue blanket market certificates exceeded FERC's authority under the NGA. Nor could Gallo raise such an argument in this action, because the NGA requires that such challenges be first brought before FERC. 15 U.S.C. § 717r; *see e.g., Cal. ex rel. Lockyer*, 383 F.3d at 1011-13.[11]

---

[11]To clarify, there are two different types of challenges to FERC-authorized rates. In a number of cases, such as this one, a buyer brings a

**[4]** Moreover, although the Supreme Court initially applied the Filed Rate Doctrine to actual filed rates, courts have held that the principles underlying this doctrine preclude challenges to a wide range of FERC actions, not just the act of literal rate filing. As the district court pointed out, the principle of barring challenges to FERC's decisions extends to "such regulatory determinations as allocation of costs, penalties for violations of the tariff's provisions, and market protocols governing sales through state regulatory structures," *E. & J. Gallo Winery*, 2005 WL 2435900, at \*11 n.3 (internal citations

---

state law or federal antitrust action against a seller, who in turn raises the Filed Rate Doctrine as an affirmative defense. *See e.g.*, *Grays Harbor*, 379 F.3d 641; *Snohomish*, 384 F.3d 756. In the context of such collateral challenges to FERC-authorized rates, we do not consider whether the FERC-authorized rates are just and reasonable. Rather, under the principles of the Filed Rate Doctrine, they are just and reasonable as a matter of law. In the case of market-based rates, although we have considered whether FERC exercised its authority to set rates, we have not considered whether FERC erred in determining that market-based rates were just and reasonable. *See Grays Harbor*, 379 F.3d at 651-52; *Snohomish*, 384 F.3d at 760.

We have also considered challenges to FERC-authorized rates that arise in a different context, namely, where a party directly challenges a FERC decision implementing its rate-setting authority. *See e.g., Cal. ex rel. Lockyer*, 383 F.3d 1006; *see also Public Utility District No. 1 of Snohomish County Washington v. FERC* ("*PUD of Snohomish*"), 471 F.3d 1053, 1082-84 (9th Cir. 2006). Parties claiming that FERC has not fulfilled its statutory obligation to ensure just and reasonable rates must present this issue to FERC in the first instance. We may review FERC's determination on appeal. 15 U.S.C. § 717r; 16 U.S.C. § 825l(b). Unlike the collateral challenges described above, such direct challenges do require us to determine whether FERC has properly exercised its rate-making authority. In direct appeals of FERC decisions to authorize market-based rates, we have considered whether "approval of such tariffs was conditioned on the existence of a competitive market." *Cal. ex rel. Lockyer*, 383 F.3d at 1013. We thought it relevant that FERC approved market-based rates only after finding that the seller did not have, or had adequately mitigated, market power and that FERC required seller to file periodic reports summarizing its transactions. *Id.* This second type of challenge is not before us today, and we do not reach the question whether FERC's implementation of its rate-making authority in the natural gas arena complied with its statutory obligations under the NGA.

omitted), as well as "the services, classifications, charges, and practices included in the rate filing." *Id*. By the same token, the Filed Rate Doctrine would extend to FERC's decision to approve market-based rates.

**[5]** We have indicated in the electricity arena that so long as FERC "continues to engage in regulatory activity" and has not effectively abdicated its rate-making authority, FERC's approval of market-based rates under the FPA would have the same preclusive effect on antitrust claims and state damage actions as did FERC's approval of literally filed rates. *See Grays Harbor,* 379 F.3d 641; *Snohomish*, 384 F.3d at 760. In *Grays Harbor*, a public utility district argued that its action against an energy wholesaler was not barred by the Filed Rate Doctrine because the doctrine did not apply in the deregulated market "where prices are negotiated between parties and the rates are not filed and approved in advance by FERC." 379 F.3d at 647-48. Using the principles underlying the Filed Rate Doctrine, we rejected this argument on several grounds.

First, we held that the state law contract claims were barred by principles of field preemption because the plaintiff's requested relief "seems to require the district court, at some point, to determine the fair price of the electricity that was delivered under the contract." *Id.* at 648. We concluded that "the requested relief intrudes on an 'identifiable portion' of a field that the federal government has occupied and addresses a matter" that the federal government regulates. *Id.* We also held that conflict preemption barred state law claims: Grays Harbor's damage action created an actual conflict between federal and state law because "by asking the court to set a fair price, Grays Harbor is invoking a state rule (specifically, contract law) that would interfere with the method by which the federal statute was designed to reach its goals (specifically, FERC regulation of wholesale electricity rates)." *Id.* at 650. We next held that the federal antitrust claims would also be barred by the Filed Rate Doctrine because the relief sought by Grays Harbor would require the court to set damages by

assuming a hypothetical rate, the "fair value," in place of the "market-based rate regime established by FERC." *Id.* at 651. This would violate the Filed Rate Doctrine because the FERC market-based rates were the lawful rates. *Id.*

Finally, a failure by FERC to exercise its statutory authority to approve rates would cast doubt on the underlying premise of the Filed Rate Doctrine, i.e., that FERC-approved rates are just and reasonable as a matter of law and thus are not subject to collateral challenge. In response to Grays Harbor's claim that "FERC simply did not set any rates," *id.*, we relied on FERC's assertions that it was continuing to exercise its authority in the electricity arena. We noted FERC's statement that it continued its market oversight by granting permits to sell at market-based rates only after making a determination that the seller lacked market power and could not "erect other barriers to entry." We noted that "[a]ccording to FERC, these conditions assure that the market-based rates charged comply with the FPA's requirement that rates be just and reasonable." *Id.*; *see also Snohomish*, 384 F.3d at 760-61. We further noted that FERC's oversight was ongoing, that FERC imposed various reporting requirements on sellers, and that "FERC has clearly stated its belief that these procedures satisfy the filed rate doctrine for market-based rates." *Grays Harbor*, 379 F.3d at 651 (quotation marks omitted). We concluded that market-based rates "do not fall outside of the purview" of the Filed Rate Doctrine. *Id. Snohomish* relied on *Grays Harbor* in concluding that FERC was "doing enough regulation to justify federal preemption of state laws." 384 F.3d at 757.

**[6]** Because "the FPA and the [NGA] are 'substantially identical,' [and] there is an 'established practice of citing interchangeably decisions interpreting the pertinent sections of the two statutes,' " *Grays Harbor*, 379 F.3d at 649 n.8 (quoting *Arkla*, 453 U.S. at 577 n.7), the Filed Rate Doctrine analysis in *Grays Harbor* is also applicable to market-based rates under the NGA. First, federal preemption of state damage claims applies to the natural gas arena as well as to the

electricity arena. A challenge to market-based natural gas rates established pursuant to FERC's blanket market certificate would require a court to reconsider natural gas rates that FERC had already determined to be reasonable. Because Congress preempted the field by giving FERC exclusive jurisdiction over such rates, challenges to such rates are barred by field preemption, as in *Grays Harbor*. *See id.* 647-49; *see also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 305 (1988) ("Congress occupied the field of matters relating to wholesale sales and transportation of natural gas in interstate commerce.").

Second, permitting a state court to grant an aggrieved party "a refund" in natural gas rates under FERC jurisdiction would create a conflict with FERC's authority to approve market-based rates, and thus is similarly preempted by conflict preemption. *Grays Harbor*, 379 F.3d at 649-50. Such a state-ordered refund may also conflict with the authority FERC has to order retroactive refunds if the conduct of sellers under FERC's jurisdiction violated the terms of the market-based certificates. *See Cal. ex rel. Lockyer*, 383 F.3d at 1016 (finding in the context of the FPA that "[t]he power to order retroactive refunds when a company's non-compliance has been so egregious that it eviscerates the tariff is inherent in FERC's authority to approve a market-based tariff in the first instance.").

The Filed Rate Doctrine bars federal antitrust claims in the natural gas arena just as it does in the electricity arena. Because FERC is implementing a market-based rate regime for natural gas, a court action challenging rates subject to FERC's jurisdiction under federal antitrust law would violate the scope of authority given to FERC by Congress.

**[7]** Finally, we can also conclude that FERC exercised its statutory authority under the NGA to approve natural gas rates, so that the underlying premise of the Filed Rate Doctrine remains applicable. Similar to its analysis in the electric-

ity arena, FERC determined that the best way to ensure just and reasonable rates in the evolving natural gas market was to allow natural gas sales to proceed at market prices. 57 Fed. Reg. at 13,296 n.213. As noted in our foregoing historical review, *supra* 12541-42, in order to ensure that market power was adequately mitigated in the natural gas arena, FERC reviewed the natural gas market and determined it was competitive. *See* 57 Fed. Reg. at 13,296-97; 57 Fed. Reg. at 57,957-58. Although FERC did not impose individualized reporting requirements on sellers of natural gas, FERC maintained ongoing oversight of the market and took corrective responses to evidence of market manipulation. *See supra* pp. 12541-42. In describing its exercise of rate-making authority, FERC asserted that "the Commission is instituting light-handed regulation, relying upon market forces at the wellhead or in the field to constrain unbundled pipeline sale for resale gas prices within the NGA's 'just and reasonable' standard." 57 Fed. Reg. at 13,297 n.220; *see also*, 57 Fed. Reg. at 57,957-58. Because FERC has not abdicated its responsibilities but has acted, albeit with a light hand, to authorize just and reasonable rates in the natural gas arena, the Filed Rate Doctrine continues to preempt any rate-setting activities by the courts and bar federal antitrust claims under the Filed Rate Doctrine.[12]

---

[12]We reject Gallo's arguments that footnotes 5 and 14 in *Arkla* represent the Supreme Court's conclusion that the Filed Rate Doctrine applies only to rates actually filed with FERC. In footnote 5, the Supreme Court noted FERC's determination that the filed rate doctrine did not apply to gas producers after 1972, because after that date, the gas producers became "small producers," who were no longer required to file a rate with FERC. 453 U.S. at 576 n.5. The Court further stated that FERCs "small producer" finding "is not before us, and we do not believe that the state courts erred in deferring to that finding." *Id*. at n. 5. In footnote 14, the Court stated: "There is no bar to damages for the period after respondents gained 'small producer' status. *See* n. 5, *supra*." *Id.* at 584 n.14. Gallo puts too much weight on these brief explanatory asides. The Supreme Court does not explain the reason there was no bar to damages after the gas producers became small producers, and the Court may simply have deferred to FERCs then-current position on the issue. Accordingly, these footnotes do not control the issue before us.

Gallo argues that *Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003), stands for the proposition that once a federal regulatory agency replaces filed rates with market-based rates, the filed rate doctrine and federal preemption no longer apply. Gallo's reliance on *Ting* is misplaced. In *Ting*, we held that the filed rate doctrine did not bar a plaintiff from challenging market-based telephone rates permitted by the Federal Communications Commission ("FCC") under the recently amended Federal Communications Act. *Id.* at 1139. Although the Federal Communications Act had previously included a filed rate procedure similar to that in the FPA and NGA, Congress "fundamentally altered" the filed rate procedure in 1996 through statutory amendments that authorized the FCC to eliminate the rate filing requirement and rely solely on market rates. *Id.* at 1132. We determined that in enacting the 1996 amendment, Congress intended to "replace the filing mechanism with a market-based mechanism that expressly encompassed state law." *Id.* at 1144. Because Congress did not intend to preempt state law, we allowed the plaintiff to pursue its state law claim. The legislative changes to the Federal Communications Act, reflected in *Ting*, did not occur in the energy arena. Congress has not made a similar statutory change to the NGA or FPA such that FERC is permitted to abdicate its authority and, without any oversight, leave rate setting entirely to the markets remaining within FERC's jurisdiction.

**[8]** We conclude, therefore, for purposes of a challenge to market-based rates for natural gas transactions under FERC's jurisdiction, the principles of the Filed Rate Doctrine are applicable. This means that the market-based rate for natural gas transactions under FERC's jurisdiction are FERC-authorized rates, and cannot be the basis of a federal antitrust or state damage action.

*Whether Gallo's Claims Based on Retail Rates and the Indices are Barred by the Filed Rate Doctrine.* Having determined that the market-based rates for transactions within FERC's jurisdiction are FERC-authorized rates, we must con-

sider the second question, whether Gallo's specific claims are barred. To answer this question we must consider two additional issues. First, we must consider whether the Filed Rate Doctrine can bar damage claims based on an index that represents market-based wholesale rates, but that is not a rate itself. And second, we must consider whether Gallo's damage claims that challenge FERC-authorized rates can be barred by the Filed Rate Doctrine, given that Gallo is making retail purchases which are outside FERC's jurisdiction.

**[9]** *Whether the Filed Rate Doctrine bars damage arising from retail purchases.* Now that we have determined that market-based rates can be FERC-authorized rates, our decision in *County of Stanislaus v. Pac. Gas and Elec. Co.*, 114 F.3d 858 (9th Cir. 1997), readily resolves the second issue: whether Gallo's status as a retail purchaser would allow it to challenge FERC-authorized rates. In *County of Stanislaus*, retail customers brought a class action against Pacific Gas & Electric Company ("PG&E"), PG&E's pipeline company, Pacific Gas Transportation ("PGT"), and PG&E's aggregator and exporter of Canadian gas, Alberta & Southern Gas Company ("A&S"). Among other claims, plaintiffs sought treble antitrust damages for injuries caused by the defendants' price fixing activities. *Id.* at 863. Specifically, the plaintiffs claimed that A&S conspired with Canadian producers to increase the price A&S paid for gas above the market rate; A&S sold the over-priced gas to PGT, which subsequently sold the gas to PG&E. *Id.* at 860. PG&E in turn sold to the retail purchaser plaintiffs, who sought as damages "the 'overcharge' that resulted from the fixed prices." *Id.* at 863. We held that because the price PG&E paid to PGT for gas had been approved by FERC, that price was just and reasonable. *See id.* at 861 & 863. Therefore, the retail plaintiffs could not claim an injury under the federal antitrust laws, because "an award of treble damages is not an available remedy for a [plaintiff] claiming that the rate submitted to, and approved by, [FERC] was the product of an antitrust violation." *Id.* at 863 (quoting *Square D*, 476 U.S. at 422) (alteration in original). We also

held that plaintiffs' state claims were barred: "[i]t makes no difference that plaintiffs choose to bring some of their claims under state law; on the facts of this case, the filed rate doctrine acts to bar all the challenges that plaintiffs assert." *Id.* at 866. In barring plaintiffs' claims, we implicitly held that retail purchasers whose damages arose from upstream FERC-approved wholesale rates—in this case, the rates charged by PGT to PG&E—could not challenge such rates. By the same token, if Gallo's damage claims are based on upstream market-based rates within FERC's jurisdiction, such claims are likewise barred even though Gallo is a retail purchaser.

Cases holding that states cannot promulgate regulations that would penalize wholesale energy or natural gas purchasers for having paid wholesale rates further support this conclusion. For example, in *Nantahala Power and Light Co.*, 476 U.S. 953, the Supreme Court determined that principles of federal preemption prevented the North Carolina Utilities Commission from (in effect) forcing Nantahala Power to sell power to retail customers at rates that would not allow it to recover its costs of purchasing wholesale power at FERC-approved rates. *See also Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354, 373 (1988) ("In this case as in *Nantahala* we hold that a 'state utility commission setting retail prices must allow, as reasonable operating expenses, costs incurred as a result of paying a FERC-determined wholesale price . . . . Once FERC sets such a rate, a State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable.'") (quoting *Nantahala*, 476 U.S. at 965, 966)); *Entergy*, 539 U.S. at 49 ("[W]e conclude that the [challenged state regulation] impermissibly 'traps' costs that have been allocated in a FERC tariff."). Although these "cost trapping" cases (so called because the state agency tried to preclude the utility from recovering "trapped" wholesale costs) do not involve a retail customer attempting to bring a damage action against the utility, they support EnCana's position that wholesale sellers such as EnCana may raise the filed rate doctrine as a defense to actions putatively attacking retail

rates, but having the effect of disallowing FERC-approved wholesale rates.

[10] In light of *County of Stanislaus* and the cost-trapping cases, Gallo cannot challenge its retail rates by claiming that FERC-authorized rates were the result of misconduct, any more than the retail purchasers in *County of Stanislaus* could claim they were injured by PG&E's purchases from PGT. It is irrelevant (in this case) that Gallo purchased natural gas for its own consumption, because the lesson of *County of Stanislaus* is that a retail purchaser cannot recover damages based on a theory that FERC-authorized rates were unfair. Therefore, we must partially disagree with the district court's conclusion that Gallo could challenge its retail rates because the court was "not required to undo or second guess a determination that was specifically made by FERC." *E. & J. Gallo Winery*, 2005 WL 2435900, at *21. To the extent Gallo's challenge to the indices is a challenge to those market-based wholesale rates subject to FERC's jurisdiction that are included in the indices, Gallo's claim would be barred by the Filed Rate Doctrine.[13]

---

[13]We do not address the question whether a plaintiff could potentially develop a methodology to challenge its retail rates without challenging authorized rates. Certain district courts that previously addressed this appeared to assume that, for all practical purposes, the indices reflect FERC-authorized rates. *See e.g.*, *In re Western States Wholesale Natural Gas Antitrust Litig.* (*Abelman Art Glass*), 408 F.Supp.2d 1055 (D.Nev. 2005); *In re Western States Wholesale Natural Gas Antitrust Litig.* (*Texas-Ohio*), 368 F.Supp.2d 1110 (D. Nev. 2005); *Sierra Pac. Resources, Inc. v. El Paso Co.*, No. CV-S-03-0414-JCM-RJJ (D. Nev. Dec. 8, 2004). This practical conclusion may turn out to be factually correct in this case: for example, if the number of non-FERC-authorized rates included in the indices was de minimis compared to the number of FERC-authorized rates, the impact of any manipulation of the non-FERC-authorized rates may have had a de minimis impact on the rates paid by Gallo. Similarly, it may not be possible to link EnCana to any damages experienced by Gallo due to manipulation of non-FERC-authorized rates. However, given the state of this record, we cannot resolve these factual issues on summary judgment. Gallo is entitled to an opportunity to develop these issues and to prove its damages.

Gallo contends that such a ruling could leave it without a remedy for EnCana's misconduct. This equitable consideration does not compel a different result. Any lack of remedy arises from the principle of statutory construction announced in *Keogh*, namely, that Gallo cannot be damaged by a FERC-approved rate even if that rate were artificially inflated. *See Keogh*, 260 U.S. at 163. The Supreme Court has acknowledged that "[a] finding that federal law provides a shield for the challenged conduct will almost always leave the state-law violation unredressed." *Arkla*, 453 U.S. 584; *see also Montana-Dakota Utilities Co. v. Nw. Public Service Co.*, 341 U.S. 246, 254 (1951).

*Whether the Filed Rate Doctrine bars damage claims based on indices.* The conclusion that Gallo's damage claims are barred to the extent they challenge FERC-authorized rates leads us to the next, more complicated issue: whether the Filed Rate Doctrine bars claims based on rates reported in the indices.

EnCana first argues broadly that because the indices constitute a compilation of FERC-authorized rates, the Filed Rate Doctrine bars damage actions based on rates reported in the indices. Under our analysis, EnCana's argument could prevail only if: (1) all the rates reported in the indices are FERC-authorized rates or there is some other bar to challenging such rates; or (2) the Filed Rate Doctrine bars a challenge to a compilation of both FERC-authorized rates and rates that are not under FERC's jurisdiction.

[11] With respect to the first argument, viewing the evidence in the light most favorable to Gallo, EnCana has not carried its burden of establishing that all the transactions that comprise the indices were FERC-approved transactions or otherwise shielded from challenge. The district court did not determine the exact nature of the transactions that comprise the indices upon which Gallo bases its damage claim. However, viewing the evidence in a light most favorable to Gallo,

the record reflects that the indices potentially include transactions that are under FERC's jurisdiction as well as transactions outside FERC's jurisdiction. First, there is evidence in the record some index pricing inputs were misreported or wholly fictitious. Final Report, at ES-6 & III-29. Misreported rates and rates reported for fictitious transactions are not FERC-approved rates, and barring claims that such fictitious transactions damaged purchases in the natural gas market would not further the purpose of the filed rate doctrine. *See E. & J. Gallo Winery*, 2005 WL 2435900, at *21.

**[12]** Moreover, as part of its investigation of the indices, FERC concluded that it "has jurisdiction over *most* of the transactions that form the basis for the indices." Final Report at III-17 (emphasis added). This language indicates that at least some of the transactions included in the indices are not subject to FERC's jurisdiction, and thus would be subject to challenge by Gallo. In addition, FERC's description of the haphazard manner in which the indices are assembled indicates that the traders reporting their transactions did not differentiate between jurisdictional and non-jurisdictional transactions within the wholesale market. Final Report, at III-29. As discussed above, *see supra* 12540-42, during the time period for which Gallo seeks damages, consumers participated in the wholesale market. *E. & J. Gallo Winery*, No. 2005 WL 2435900, at *3-4. These consumer transactions, which are not regulated by FERC, were potentially included in the indices. In addition, first sales transactions, either at the wellhead or via imports from Canada and Mexico, were potentially included in the indices. These first sales are also outside of FERC's jurisdiction.

EnCana argues that even if first sales were reported in the indices, principles of federal preemption nevertheless bar any damage claims based on such rates.[14] EnCana relies on *Trans-*

---

[14]EnCana argues that the Filed Rate Doctrine bars claims based on first sales because some of the natural gas in sales at issue in *County of Stanis-*

*continental Gas Pipe Line Corp. v. State Oil and Gas Board of Mississippi*, 474 U.S. 409 (1986), which established that in deregulating first sales in the NGPA, Congress intended to keep the field clear of state regulations of first sales. By extension, EnCana argues, principles of preemption would prevent Gallo from bringing damage claims that have the effect of reducing the purchase price of first sales.

[13] EnCana's analysis is incomplete and therefore incorrect. Our review of the NGPA and WDA leads us to conclude that Congress's removal of FERC's jurisdiction over first sales does not preempt the type of claims brought by Gallo in this action. In enacting the NGPA and the WDA, Congress is assumed to be aware of the existing context of state and federal antitrust and damage laws. *United States v. Hunter*, 101 F.3d 82, 85 (9th Cir. 1996) ("[A]s a matter of statutory construction, we presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.") (quotation marks omitted). We ordinarily do not deem Congress to preempt laws of general applicability. *See Total TV v. Palmer Commc'ns, Inc.*, 69 F.3d 298, 302 (9th Cir. 1995). Neither the NGPA nor the WDA, the two statutory enactments that removed first sales from FERC's rate-setting jurisdiction, includes language suggesting that Congress intended to displace state antitrust or damage laws by withdrawing first sales from the NGA. Congress's decision not to expressly preempt such damage claims indicates a lack of intent to do so. *See id.* Although Congress's withdrawal of first sales from FERC's jurisdiction does reflect "Congress' intent to move toward a less regulated national natural gas market," *Transcon.*, 474 U.S. at 423, state and federal antitrust and fair competition

---

*laus* was imported from Canada and those sales would have been first sales under the NGPA. *County of Stanislaus* did not expressly address this issue, and "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having [been] so decided as to constitute precedents." *In re Larry's Apartment, L.L.C.*, 249 F.3d 832, 839 (9th Cir. 2001) (alternation in original) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)).

laws complement rather than undermine such a goal, *see Total TV*, 69 F.3d at 302, because they support fair competition. By enabling private parties to combat market manipulation and other anti-competitive actions, the laws under which Gallo brought its claim support "Congress' determination that the supply, the demand, and the price of high-cost [first sale] gas be determined by market forces," *Transcon.*, 474 U.S. at 422. Just as Congress's direction to FERC to determine just and reasonable rates gave rise to the inference that Congress pre-empted damage claims per the Filed Rate Doctrine, the with-drawal of FERC's authority to determine such rates gives rise to the opposite inference, that normal market forces, including the tug and pull of private lawsuits, will hold sway. Therefore, we conclude that Congress did not preclude plaintiffs from basing damage claims on rates associated with first sales.

Encana also argues that, even though first sales are exempted from FERC's rate-setting jurisdiction, Congress has determined that all first sales occur at rates that are just and reasonable as a matter of law. For this proposition, EnCana relies on a provision of the WDA, which states: "Except as otherwise provided in this subsection, for purposes of sections 4 and 5 of the Natural Gas Act, any amount paid in any first sale of natural gas shall be deemed to be just and reasonable." 15 U.S.C. § 3431(b)(1)(A). (Sections 4 and 5 of the NGA, 15 U.S.C. §§ 717c and 717d, govern the rates that can be charged under FERC's rate-setting jurisdiction.) Encana's interpreta-tion of section 3431(b) is incorrect. Section 3431(a) provides that the NGA "shall not apply to any natural gas solely by rea-son of any first sale of such natural gas." 15 U.S.C. § 3431(a)(1)(A). Because FERC's jurisdiction is limited to the scope of the NGA, this language eliminates FERC's gen-eral authority over first sales.

However, Section 3431(b)(1)(A)'s general statement that any amounts paid in first sales are "just and reasonable" is not inconsistent with section 3431(a)'s exclusion of first sales from the NGA. Rather, Section 3431(b) can be understood as

ensuring that FERC will not exercise its rate-setting jurisdiction in a way that prevents regulated entities from recovering amounts paid in first sales. In other words, after an interstate pipeline, intrastate pipeline, or local distribution company purchases natural gas in a first sale, any subsequent sale of that gas is not a first sale. To the extent FERC has rate-setting authority with respect to those subsequent sales, FERC could determine that the "just and reasonable" rate for such sales was lower than the rate that would be necessary for the regulated entities to recover the prices they paid for the natural gas in their first sale transactions. This would allow FERC to create its own "cost-trapping" scenario. Section 3431(c)(2), however, ensures that such cost-trapping will not occur, because it provides that "for purposes of sections 4 and 5 of the Natural Gas Act, any amount paid in any first sale of natural gas shall be deemed to be just and reasonable." 15 U.S.C. § 3431(b)(1)(A); *see also* 15 U.S.C. § 3431(c)(2). This language ensures regulated entities that they can set their sales prices for natural gas in a manner that will allow them to recover the "just and reasonable" amounts they previously paid in first sales. However, Sections 3431(b)(1)(A) and 3431(c)(2) do not mean that first sales are "just and reasonable" for other purposes, particularly because other first sales are not subject to the NGA.

EnCana raises the additional argument that the transactions comprising the indices were FERC-approved transactions or otherwise shielded from challenge because FERC has jurisdiction over the "transportation of natural gas in interstate commerce." 15 U.S.C. § 717(b). In essence, EnCana argues that all sales of natural gas transported in interstate pipelines are subject to FERC jurisdiction and shielded from challenge by the Filed Rate Doctrine because such sales reflect interstate transportation costs. It is true that in today's natural gas marketplace "[w]hen the gas sales element is severed—i.e., unbundled—from the transaction, FERC retains jurisdiction over the interstate transportation component." *United Distrib. Cos. v. F.E.R.C.*, 88 F.3d 1105, 1153 (D.C. Cir. 1996) (per

curiam) (emphasis omitted). However, EnCana's argument goes too far: a determination that FERC's jurisdiction covered any sale of natural gas with an interstate transportation component would extend FERC's authority over virtually all natural gas that was not produced, sold and used in a single state. Such an interpretation would conflict with 15 U.S.C. § 717(b) (providing that the NGA does not apply to sales of natural gas other than sales for resale) and 15 U.S.C. § 3431(a)(1)(A) (providing that FERC's jurisdiction does not extend to natural gas "solely by reason of any first sale of such natural gas"), and we therefore reject it. We agree that to the extent FERC has jurisdiction over the transportation of natural gas in interstate commerce and exercises that authority to approve interstate transportation rates, the Filed Rate Doctrine would prevent Gallo from basing damage claims on such rates. However, as previously discussed, Gallo is challenging at least some conduct that is not approved by FERC, and thus not barred by FERC's jurisdiction over interstate transportation.

**[14]** Having rejected EnCana's arguments that Gallo's damage claims based on the indices are barred because the indices include FERC-authorized rates or are first sales, we turn to the second argument that even if the indices are comprised of both jurisdictional and non-jurisdictional rates, we must deem the indices as a whole to be FERC-authorized rates and thus shielded from challenge by the Filed Rate Doctrine. We must also reject this argument. FERC's authority is limited to the jurisdiction specifically set by Congress. As noted in *Panhandle Eastern Pipe Line Co.*, Congress employed "unusual legislative precision" to ensure that the limits of FERC's jurisdiction were clear:

> The omission [in the NGA] of any reference to other sales, that is, to direct sales for consumptive use, in the affirmative declaration of coverage was not inadvertent. It was deliberate. For Congress made sure its intent could not be mistaken by adding the explicit prohibition that the Act 'shall not apply to any other

* * * sale * * *.' (Emphasis added.) Those words plainly mean that the Act shall not apply to any sales other than sales 'for resale for ultimate public consumption for domestic, commercial, industrial, or any other use.' Direct sales for consumptive use of whatever sort were excluded.

332 U.S. at 516-17. Similarly, the D.C. Circuit rejected pipeline companies' argument that FERC had jurisdiction over pipeline companies' nonjurisdictional contracts, even if such contracts would indirectly impact a pipeline company's FERC-approved rates. *Am. Gas Ass'n v. F.E.R.C.*, 912 F.2d 1496, 1506 (D.C. Cir. 1990). In the absence of FERC jurisdiction over non-jurisdictional transactions reported in the indices, the Filed Rate Doctrine does not bar damage claims based on rates arising from such transactions.[15]

[15] In sum, the answer to our question whether the Filed Rate Doctrine bars damage claims based on the indices is not a simple one. We must conclude that to the extent the indices are comprised of rates that are not FERC-authorized rates, the Filed Rate Doctrine does not bar Gallo's claim that such rates are unfair and led to unfair retail rates paid by Gallo. However, Gallo cannot challenge FERC-authorized rates that are incorporated in the indices. Because such rates are just and reasonable, damage claims based on such rates are barred by the Filed Rate Doctrine. Our conclusion may raise complexities in resolving claims such as Gallo's; however, this is dictated by our precedents.

---

[15]We also reject the related argument that because wholesale market rates are often derived from the indices, the Filed Rate Doctrine bars damage claims based on all rates reported in the indices. We are aware of no basis for holding that the Filed Rate Doctrine bars claims based on a reference point for pricing transactions (be it a trade index, the Consumer Price Index, or the New York Stock Exchange) that is not itself a FERC-approved rate.

C

EnCana's Summary Judgment Motion

In conclusion, Gallo's claims are based on damages it incurred due to paying retail rates pegged to indices it alleges were artificially inflated by illegal practices. As we have explained, to prevail on its summary judgment motion that Gallo's damage claims were barred by the Filed Rate Doctrine as a matter of law, EnCana would have had to establish that all transactions in the indices were transactions under FERC jurisdiction. Viewing the evidence most favorably to Gallo, as we must in considering EnCana's summary judgment motion, EnCana has not carried this burden. Rather, the record reflects that the indices may also include reports of transactions that were not subject to FERC jurisdiction. The Filed Rate Doctrine does not bar Gallo's damage claims based on rates that are not FERC-authorized rates.

We therefore conclude that the district court did not err in denying EnCana's summary judgment motion. "[W]e may affirm [the district court] on any basis supported by the record." *Saltarelli v. Bob Baker Group Med. Trust*, 35 F.3d 382, 387 (9th Cir. 1994). On remand, the district court may consider Gallo's claims to the extent they are based on rates that are not FERC-authorized rates.

**AFFIRMED.**

---

B. FLETCHER, Circuit Judge, concurring:

I concur in the majority opinion but sound a note of concern and caution. The filed-rate doctrine was developed in the context of filed tariffs that were subject to the usual regulatory process — a time and procedure for public comment and complaint and room for disallowance or adjustment by the

regulators. Courts have expanded its application of the doctrine to market-based rates as being FERC-authorized and entitled to the same deference as filed rates, deeming them to be just and reasonable because FERC supposedly actively regulates and oversees the setting of rates. However, I find no evidence that FERC has set a standard for the determination of what is a just and reasonable rate nor have the courts done so. I fear we talk a better game than we play.[1]

We have held in our electricity cases that establishment of a market-based rate as a FERC-authorized rate requires active FERC oversight of the market. *See Pub. Util. Dist. No. 1 of Grays Harbor County Wash. v. IDACORP Inc. ("Grays Harbor")*, 379 F.3d 641, 651 (9th Cir. 2004) ("The fact that the rates at issue in this case are market based does not alter this conclusion. . . . Before allowing Idaho Power Company to charge market-based rates, FERC first confirmed that Idaho Power Company did not have, or had adequately mitigated, market power in generation and transmission and could not erect other barriers to entry. Idaho Power Co., 78 F.E.R.C. ¶ 61,343, 1997 WL 139585, at *1 (Mar. 27, 1997). Further, the ability to charge market-based prices comes with certain filing requirements, including providing FERC with individual service agreements for contracts such as the one at issue here. See id. at *3. Even in the context of market-based rates, FERC actively regulates and oversees the setting of rates."); *Pub. Utility Dist. No. 1 of Snohomish County v. Dynergy Power Marketing, Inc.*, 384 F.3d 756, 762 (9th Cir. 2004) ("*Snohomish*") ("Because FERC has exclusive jurisdiction over interstate sales of wholesale electricity, and continues to engage in regulatory activity, we affirm."). At a minimum, active oversight requires periodic FERC inquiries into the status of the market to ensure that no seller or combination of

---

[1]A provocative article in the *New York Times*, September 4, 2007, compares electricity rates of states that regulate and those that allow market forces to set rates suggesting non-regulating states have startlingly higher rates.

sellers may exercise market power and that the market-based rates being charged are just and reasonable. Without minimum standards for FERC oversight, the Filed Rate Doctrine threatens to come unmoored from its rationale of respecting the actions of a federal agency to which Congress has delegated authority. Instead, I fear respect is being given to agency passivity, allowing anticompetitive and otherwise illegal actions to escape review.