**MEDCO ENERGI U.S., L.L.C.**

v.

**SEA ROBIN PIPELINE CO., L.L.C.**

Civil Action No. 09–0971.

United States District Court,
W.D. Louisiana,
Lafayette–Opelousas Division.

June 14, 2012.

New Orleans, LA, for Sea Robin Pipeline Co., L.L.C.

## MEMORANDUM RULING

REBECCA F. DOHERTY, District Judge.

Pending before this Court are two motions filed by defendant Sea Robin Pipeline Co., L.L.C. ("Sea Robin"), as follows: (1) Motion for Summary Judgment on State Law Grounds [Doc. 80], and (2) Motion for Summary Judgment on Federal Preemption [Doc. 81]. Both motions are opposed by plaintiff Medco Energi US, L.L.C. ("Medco") [Docs. 84 & 85], and Sea Robin has filed Motions for Leave to File Reply briefs in connection with both motions for summary judgment [Docs. 86 & 87], which are hereby GRANTED.

In its motion for summary judgment on preemption grounds, Sea Robin argues Medco's state law claims for negligence, negligent misrepresentation, detrimental reliance, fraud, and violations of the Louisiana Unfair Trade Practices Act are preempted by the Supremacy Clause of the United States Constitution under the doctrine of field preemption and the filed rate doctrine, and, specifically with respect to Medco's negligence claims, preemption by FERC proceedings.

Because this Court agrees Medco's claims are barred by one or all of the foregoing preemption doctrines, this Court need not consider Sea Robin's motion for summary judgment on state law grounds. Accordingly, Sea Robin's motion for summary judgment on federal preemption is GRANTED, and Medco's claims against Sea Robin are DENIED AND DISMISSED WITH PREJUDICE as preempted by federal law. Sea Robin's motion for summary judgment on state law grounds is DENIED as moot.

## I. Factual and Procedural History

The following facts are undisputed:[1]

Paul M. Jones, Brian Wesley Capell, Liskow & Lewis, Lafayette, LA, for Medco Energi U.S., L.L.C.

Scott Hervey Mason, James Keith Ordeneaux, G. Bruce Parkerson, Andrew L. Plauche, Jr., Plauche Maselli Parkerson,

1. To their opposition brief to Sea Robin's motion for summary judgment on federal preemption, Medco attaches a "Statement of Uncontested Facts," wherein Medco asserts it

"does not object to the factual statements contained in Sea Robin's Statement of Uncontested Facts, except that, to the extent Sea Robin cites to or quotes from docu-

1. Sea Robin is a natural gas company engaged in the transportation of natural gas, which is subject to FERC jurisdiction.

2. Sea Robin's Second Revised Volume No. I Gas Tariff was issued on November 22, 2004, approved by the Federal Energy Regulatory Commission ("FERC"), and became effective on December 31, 2004.

3. From time to time between the original effective date of the Second Revised Volume No. 1 Tariff and later versions, individual Tariff sheets were revised by Sea Robin, then filed with and approved by FERC, becoming effective on the dates reflected by the individual Tariff sheets.

4. Sea Robin's Gas Tariff provides as follows:

2.1 The transportation services provided under this Rate Schedule ITS shall be performed under Subparts B and G of Part 284 of the Federal Energy Regulatory Commission's Regulations. This Rate Schedule ITS shall apply to all gas transported by Sea Robin for Shipper pursuant to an executed ITS Agreement.

2.2 Service hereunder shall be provided on an interruptible basis.

2.5 To the extent that Sea Robin complies with the provisions of its General Terms and Conditions and its Rate Schedule ITS, it shall have no liability to any shipper receiving service under Rate Schedule ITS arising from or related to service thereunder except as provided in such General Terms and Conditions and Rate Schedule ITS.

(a) Sea Robin makes no representation, assurance or warranty that capacity will be available on Sea Robin's Pipeline System at any time.

4.0 The provisions of the General Terms and Conditions of this Tariff, as such provisions may be amended from tune to time, are hereby incorporated by reference and made a part of this Rate Schedule ITS, and shall apply to service rendered hereunder, as though stated herein.[2]

3.9 Sea Robin shall not be required to perform service unless all facilities necessary to render the requested service exist and are in good operating condition.

16.2 As between Shipper and Sea Robin, Shipper shall be deemed to be in control and possession of the gas and responsible for and shall hold Sea Robin harmless of and from any damage or injury caused thereby until it shall have been delivered to Sea Robin at the Sea Robin Point(s) of Receipt, and while such gas is in facilities other than facilities owned or controlled by Sea Robin after which Sea Robin shall be deemed to be in control and possession of such gas only while such gas is in facilities owned or controlled by Sea Robin, and until its delivery to Shipper, or for Shipper's account, at Sea Robin's Point(s) of Delivery. While in such possession Sea Robin shall be responsible for and hold Shipper harmless of and from any damage or injury caused thereby, except for gas tendered by Shipper which fails to meet the provisions of Section 12 hereof, which gas shall be deemed, for purposes hereof, to remain in the possession

ments...... those documents are the best evidence of their contents." *See* Doc. 84–1.

**2.** *See* Exhibit "2–C," attached to Doc. 52, "Rate Schedule ITS", 2.1, 2.2, 2.5, 4.0, pp. Sea Robin–014996 through Sea Robin–014999.

and control of Shipper. *Sea Robin shall have no responsibility with respect to any gas to be transported until it is received by Sea Robin, or on account of anything which may be done, happen or arise with respect to said gas before such receipt.* Except as provided in the second preceding sentence and except for Shipper arrangements for separation, treating, dehydration, and/or processing, Shipper shall have no responsibility with respect to said gas after its receipt by Sea Robin, or on account of anything which may be done, happen or arise with respect to said gas after such receipt until its delivery to Shipper, or for Shipper's account, at Sea Robin's Point(s) of Delivery. The foregoing provisions of this paragraph shall not relieve either party from responsibility for acts of gross negligence of such party, its agents or employees.[3]

5. Firm service at the time of Hurricane Ike cost shippers approximately 30 times more than interruptible service according to Sea Robin's Tariff.

6. FERC is currently conducting proceedings to establish a Hurricane Surcharge to offset the cost of restoring the pipeline to service following Hurricane Ike.

7. Sea Robin initiated the FERC proceedings to recover the costs associated with restoring its line to service. Those costs have now exceeded $118,000,000.

8. Sea Robin sought to recover these extraordinary costs in the form of a surcharge to be incorporated into its Tariff.

9. Medco appeared in the proceeding, and filed a Motion to Intervene and Protest.

10. After filing the Motion to Intervene and Protest, Medco failed to file any further briefs in the proceeding.

11. Other shippers claimed in the proceeding that "there are questions regarding whether Sea Robin did act expeditiously and efficiently to restore system operations."

12. Other parties complained in the proceeding that it took Sea Robin "15 months to restore a major supply leg of its system."

13. FERC's Initial Decision allows Sea Robin to impose the surcharge, at a rate that allows 21.4 years to recover the restoration costs incurred.

14. Among the reasons for its holding, FERC stated "current shippers were primarily benefitted by Sea Robin's quick return to service."

15. FERC also found that Sea Robin's repairs allowed it to "resume full service as quickly as possible following a catastrophic event."

16. According to FERC, "Sea Robin's repairs to the system provided an important service to the public by allowing the continued access to natural gas reserves at a competitive price."

In its motion for summary judgment, Sea Robin argues it transports natural gas produced by companies such as Medco via Sea Robin's pipeline from points on the outer continental shelf to transportation facilities onshore. The gas is then transported throughout the United States. Sea Robin argues it sustained losses in excess of $118,000,000.00 as a result of damage to its facilities during Hurricane Ike, which crossed the Gulf of Mexico in mid-September 2008. Facilities owned by Sea Robin in the "West Leg" are the focus of the instant litigation. Sea Robin acknowledges all producers on the West Leg, in-

**3.** *Id.* at ¶¶ 3.9, 16.2, pp. Sea Robin–015023 and Sea Robin–015087.

cluding Medco, were shut in while Sea Robin repaired its pipeline damage.

On May 19, 2009, Medco filed suit against Sea Robin in the Fifteenth Judicial District Court for the Parish of Lafayette, Louisiana. In its petition, Medco asserts claims against Sea Robin for negligence, detrimental reliance, negligent misrepresentation, fraud, and violations of Louisiana's Unfair Trade Practices Act ("LUTPA"), La.Rev.Stat. § 51:1401, *et seq.* The gist of Medco's claims against Sea Robin is that Sea Robin misrepresented when Sea Robin would be ready to resume transportation to its pipeline. Therefore, Medco's alleged damages arise from reliance on that representation and thus the alleged resultant delayed access to pipelines operated by Sea Robin following Hurricane Ike in September 2008. Medco argues Sea Robin had a regulatory duty to provide "open and nondiscriminatory access to its pipelines;" "a duty to ensure that its representations concerning repairs to the pipeline system were accurate;" and "a duty to repair its pipelines in a reasonable manner once it had undertaken a duty to do so and committed to that duty with its public and private representations." Medco alleges Sea Robin's repairs to its pipelines were grossly inadequate; its representations concerning those repairs either negligently or intentionally inaccurate; and its return to service so delayed as to cause great economic harm to Medco. Medco avers it would not have sustained the economic damages it did had Sea Robin accurately represented its inspection and repair efforts, including the date the lines could reasonably have been returned to service as Medco argues but for the misrepresentation, it would have undertaken substantial expense to tie into a competitor's line

much earlier than the date Sea Robin finally returned to service.[4]

Despite pleading several different theories of liability, Medco seeks damages under each theory which are virtually identical, *i.e.,* for damages related to its inability to "market its production;" to "get its production to market in a timely manner;" and a reduction in the "marketable value" of its properties. Medco also seeks exemplary damages under LUTPA. In essence, Medco asserts Sea Robin owes lost revenue and/or business interruption damages due to the damage sustained to Sea Robin's pipeline.

Sea Robin removed the case on June 12, 2009, invoking both this Court's diversity jurisdiction and jurisdiction under 43 U.S.C. § 1349(b)(1) and 28 U.S.C. § 1331, arguing the claims asserted by Medco assert "a case or controversy arising out of, or in connection with, an operation on the Outer Continental Shelf which involves exploration, development or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves right to such minerals......" 43 U.S.C. § 1349(b)(1).

On March 22, 2012, Sea Robin filed two motions for summary judgment. In one motion, Sea Robin seeks dismissal of Medco's claims on grounds all of the claims are preempted by the Natural Gas Act, 15 U.S.C. § 717, *et seq.,* or, alternatively, by the Filed Rate Doctrine. In the second motion, Sea Robin seeks dismissal of Medco's claims on grounds they are barred by start law doctrines.

## II. Law and Analysis

### A. Applicable Law

Sea Robin argues, and Medco does not appear to dispute, that federal jurisdiction

---

**4.** The foregoing characterization of Medco's claims is taken from Medco's Outline of

Claims, filed on October 3, 2011 [Doc. 63].

in this matter is found. Although argument is made jurisdiction couches under the Outer Continental Shelf Lands Act (OCSLA),[5] 43 U.S.C. § 1331 *et seq,* "OCSLA" adopts the law of the adjacent state (Louisiana) as surrogate federal law, to the extent that it is not inconsistent with other federal laws and regulations. "Thus the law applicable is 'federal law, supplemented by state law of the adjacent state.'" *Fruge v. Parker Drilling Co.,* 337 F.3d 558, 560 (5th Cir.2003) (citations omitted); *see also* 43 U.S.C. § 1333(a)(2)(A).

Pursuant to the language of OCSLA, Sea Robin argues OCSLA typically applies the law of an adjacent state as surrogate federal law where there is no otherwise applicable federal law with which state law would be inconsistent. Sea Robin alleges all of Medco's claims sound in tort under the laws of the state of Louisiana; however, "each of Medco's claims cannot survive since the civil law of Louisiana is not applicable or Louisiana law is otherwise inconsistent with federal law and regulations...." Sea Robin goes on to argue:

> In essence, with each of its claims, Medco alleges that Sea Robin undertook certain duties to provide transportation service to it, and that Medco sustained damages due to its inability to transport gas through Sea Robin's pipeline system to its customers. Because the source of the alleged injuries alleged by Medco— *i.e.,* Medco's inability to transport gas on Sea Robin's system when Medco felt service would be available—falls squarely within the regulatory bounds of FERC, each of its state law claims are preempted or otherwise fail as a matter of law.

Neither party disputes that preemption by way of federal law is the gravamen of the substantive issue at hand; otherwise applicable federal law would apply, and neither disputes, jurisdiction would still exist. However, if preemption does not operate, neither disputes plaintiff's claims are couched pursuant to Louisiana law by way of OCSLA, and jurisdiction would again exist. Although this matter presents in a less than ideal manner for jurisdictional purposes as preemption is argued in a manner as to suggest an affirmative defense, neither disputes jurisdiction rests with this Court under OCSLA and/or diversity in order to decide the threshold question presented, and this Court agrees, as OCSLA would provide a jurisdictional base in either instance.

### B. Summary Judgment Standard

"A party against whom a claim, counterclaim, or cross-claim is asserted or declaratory judgment is sought may, at any time, move with or without supporting affidavits for summary judgment in the parties favor as to all or any part thereof." Fed. R. Civ. Pro. 56(b). Summary judgement is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response by affidavits or is otherwise provided in this rule, must

---

5. Sea Robin argues this Court has dual bases for jurisdiction over the case, in that the case arises under OCSLA, but also contending there is diversity jurisdiction over the matter because the case involves complete diversity of citizenship between the parties and the matter in controversy exceeds $75,000.00. No party disputes the jurisdiction of this Court.

set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. Pro. 56(e)

As summarized by the Fifth Circuit in *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir.1994):

When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. *Id.* at 322, 106 S.Ct. 2548; *see also, Moody v. Jefferson Parish School Board*, 2 F.3d 604, 606 (5th Cir.1993); *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir.1991). Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" is a full trial on the merits warranted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Supreme Court has instructed:

The plain language of Rule 56(c) *mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Where no such showing is made, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

[. . . .]

... In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint. As set forth above, Rule 56(e) provides that judgment "shall be entered" against the non-moving party unless affidavits or other evidence "set forth specific facts showing that there is a genuine issue for trial." The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. *Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.*

*Lujan v. National Wildlife Federation*, 497 U.S. 871, 884, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (emphasis added)).

The Fifth Circuit has further elaborated:

[The parties'] burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence. We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is,

when both parties have submitted evidence of contradictory facts. We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts.... [S]ummary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (*en banc*) (citations and internal quotations omitted).

■ Finally, in evaluating evidence to determine whether a factual dispute exists, "credibility determinations are not part of the summary judgment analysis." *Id.* To the contrary, "in reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party, as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir.2001).

■ Because, if granted, the motion addressing federal preemption would dispose of the entire case, the Court will address that motion first.[6]

## 1. Sea Robin's Motion for Summary Judgment on Federal Preemption [Doc. 81]

### A. Field preemption

■ Sea Robin is a natural gas company engaged in the interstate transportation of natural gas within the meaning of the Natural Gas Act of 1938 ("NGA"), 15 U.S.C. § 717, *et seq.* The NGA states in relevant part:

§ 717. Regulation of natural gas companies

(a) Necessity of regulation in public interest

As disclosed in reports of the Federal Trade Commission made pursuant to S.Res. 83 (Seventieth Congress, first session) and other reports made pursuant to the authority of Congress, *it is declared that the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest.*

(b) Transactions to which provisions of chapter applicable

---

**6.** Medco argues this Court should not consider Sea Robin's preemption argument, as this defense was not included in Sea Robin's outline of claims, filed in late September/early October, 2011, and was thereby waived.

This Court notes federal preemption is an affirmative defense that must be pled and proven by the party asserting it. *See e.g., Fisher v. Halliburton*, 667 F.3d 602, 609 (5th Cir.2012). The record shows Sea Robin affirmatively pled preemption in its Answer, filed on August 17, 2009. Although Sea Robin did not specifically plead the doctrine of "field preemption," it did plead preemption under the "filed rate doctrine and/or other applicable regulations promulgated thereunder, or pursuant to any tariffs or schedules filed with FERC." Thus, since the filing of Sea Robin's

Answer, Medco has been on notice that Sea Robin intended to argue federal preemption.

Moreover, this Court notes the Supreme Court did not decide the case of *Kurns v. Railroad Friction Products Corp.*, — U.S. ——, 132 S.Ct. 1261, — L.Ed.2d —— (2012) until February 29, 2012, several months after the parties filed their outlines in this case. Without the benefit of that decision, Sea Robin arguably might not have believed the doctrine of field preemption vis-a-vis its state law tort claims might apply.

Considering the foregoing, this Court concludes there has been no prejudice to Medco—and indeed, Medco argues no prejudice—and this Court will consider Sea Robin's motion for summary judgment on federal preemption grounds as a matter of equity.

The provisions of this chapter shall apply to the *transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation,* but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.[7]

15 U.S.C. § 717(a) & (b) (emphasis added).

It is undisputed Sea Robin is subject to the jurisdiction of the Federal Regulatory Energy Commission ("FERC"), the regulatory body charged with implementation of the NGA.[8] *See* 15 U.S.C. § 717b. FERC regulates, *inter alia,* the rates charged, and services provided by, natural gas companies. The question in the instant case is whether Medco's state law claims are preempted by the NGA.

■ Questions of federal preemption require an examination of congressional intent. *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 300, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316 (1988). The Supreme Court has noted preemption of state law by federal statute or regulation is not favored "in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." *Chicago and N.W. Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981), *citing Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963).[9]

---

7. 15 U.S.C. § 717(c) states:
 (c) Intrastate transactions exempt from provisions of chapter; certification from State commission as conclusive evidence
 The provisions of this chapter shall not apply to any person engaged in or legally authorized to engage in the transportation in interstate commerce or the sale in interstate commerce for resale, of natural gas received by such person from another person within or at the boundary of a State if all the natural gas so received is ultimately consumed within such State, or to any facilities used by such person for such transportation or sale, provided that the rates and service of such person and facilities be subject to regulation by a State commission. The matters exempted from the provisions of this chapter by this subsection are declared to be matters primarily of local concern and subject to regulation by the several States. A certification from such State commission to the Federal Power Commission that such State commission has regulatory jurisdiction over rates and service of such person and facilities and is exercising such jurisdiction shall constitute conclusive evidence of such regulatory power or jurisdiction....

See 15 U.S.C. § 717(c).

8. In *Arkansas Elec. Coop. Corp. v. Arkansas Public Serv. Comm'n,* 461 U.S. 375, 378, 103 S.Ct. 1905, 1909, 76 L.Ed.2d 1 (1983), the Court noted that by the NGA, "Congress undertook to establish federal regulation over most of the wholesale transactions of electric and gas utilities engaged in interstate commerce, and created the Federal Power Commission .... (now the Federal Energy Regulatory Commission) ... to carry out that task."

9. The Court noted in *Kalo Brick:*
 The underlying rationale of the pre-emption doctrine, as stated more than a century and a half ago, is that the Supremacy Clause invalidates state laws that "interfere with or are contrary to, the laws of congress...." The doctrine does not and could not in our federal system withdraw from the States either the "power to regulate where the activity regulated [is] a merely peripheral concern" a federal law ... or the authority to legislate when Congress could have regulated "a distinctive part of a subject which is peculiarly adapted to local regulation, ...

 Federal preemption generally takes one of three forms: (1) express preemption; (2) implied preemption, which includes the concept of field preemption; and (3) conflict preemption. Within the concept of implied preemption, "field preemption" can be inferred where federal law "is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation," or "the federal interest [in the field] is so dominant" that it "preclude[s] enforcement of state laws on the same subject."[10] *Castro v. Collecto, Inc.*, 634 F.3d 779, 785 (5th Cir.2011). *See also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316 (1988) (courts may infer field preemption "where the pervasiveness of the federal regulation precludes supplementation by the States, where the federal interest in the field is sufficiently dominant, or where the object sought to be obtained by the federal law and the character of obligations imposed by it ... reveal the same purpose.")

Sea Robin does not argue express or conflict preemption applies in this case, but rather that Medco's claims are barred by the doctrine of field preemption. To determine whether field preemption applies in this case, this Court must examine the federal regulatory regime relating to the transportation of natural gas to determine whether it leaves room for state negligence, fraud, and unfair trade practices claims giving rise to a pipeline's alleged misrepresentations in informing its customers when its pipeline will be repaired and when the transportation of natural gas will resume.

The federal regulatory scheme at issue in this case—the NGA—is a "comprehensive scheme of federal regulation of 'all wholesales of natural gas in interstate commerce.'" *Schneidewind*, 485 U.S. at 300, 108 S.Ct. 1145, *citing Northern Natural Gas Co. v. State Corporation Comm'n. of Kansas*, 372 U.S. 84, 91, 83 S.Ct. 646, 650–51, 9 L.Ed.2d 601 (1963), *quoting Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672, 682, 74 S.Ct. 794, 799, 98 L.Ed. 1035 (1954). As the Court explained in *Schneidewind*:

> The NGA confers upon FERC exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale. FERC exercises authority over the rates and facilities of natural gas companies used in this transportation and sale through a variety of powers. Sections 4, 5, and 7 of the NGA, as amended, 15 U.S.C. §§ 717c, 717d, and 717f, give FERC a number of tools for examining and controlling the issuance of securities of natural gas companies in the exercise of its comprehensive authority.[11]

---

but did not....." But when Congress has chosen to legislate pursuant to its constitutional powers, then a court must find local law pre-empted by federal regulation whenever the "challenged state statute 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Making this determination "is essentially a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question whether they are in conflict." And in deciding whether any conflict is present, a court's concern is necessarily with "the nature of the activities which the States have sought to regulate, rather than on the method of regulation adopted." 450 U.S. at 317–18, 101 S.Ct. at 1130 (internal citations omitted).

10. Implied preemption can also take the form of conflict preemption: (1) where complying with both federal law and state law is impossible; or (2) where the state law "creates an unacceptable 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Castro*, 634 F.3d at 785. Sea Robin does not argue that conflict preemption applies in the instant case.

11. Examples of actions FERC may take are: (1) FERC may conduct hearings and under-

In *Schneidewind,* natural gas companies brought a declaratory judgment action challenging the assertion of jurisdiction over the issuance of securities by the Michigan State Public Service Commission. The Supreme Court affirmed the decision of the Sixth Circuit, holding the state statute seeking to regulate the issuance of securities was preempted by the NGA. *Schneidewind,* 485 U.S. at 309–11, 108 S.Ct. at 1156. In so concluding, the Court explained the statute in question was "designed to protect investors in the gas company's securities and to protect ratepayers." The Court concluded when applied to natural gas companies, the statute amounted to "a regulation of rates and facilities, a field occupied by federal regulation." [12] *Id.* at 1154.

In *Panhandle Eastern Pipe Line Co. v. Public Service Comm'n. of Indiana,* 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128 (1947), the Court was called on to determine whether Indiana had the power to regulate sales of natural gas made by an interstate pipeline carrier directly to industrial consumers in Indiana. Concluding the NGA specifically permits states to regulate direct sales of natural gas to consumers but does not permit states to regulate sales for resale (usually to local distributing companies), the Court concluded Indiana had the power to regulate direct sales, as the foregoing activity was not preempted by the NGA. 332 U.S. at 514, 68 S.Ct. 190.

In so holding, the Court noted the express language of the NGA, reasoning Congress had specifically not included direct consumer sales in the field preempted by the federal statute, to wit:

> It would be an exceedingly incongruous result if a statute so motivated, designed and shaped to bring about more effective regulation, and particularly more effective state regulation, were construed in the teeth of those objects, and the import of its wording as well, to cut down regulatory power and to do so in a manner making the states less capable of regulation than before the statute's adoption. Yet this, in effect, is what appellant asks us to do. For the essence of its position, apart from standing directly on the commerce clause, is that Congress by enacting the Natural Gas Act has 'occupied the field,' i.e., the entire field open to federal regulation, and thus has relieved its direct industrial sales of any subordination to state control.
>
> *The exact opposite is the fact. Congress, it is true, occupied a field. But it was meticulous to take in only territory which this Court had held the states could not reach. That area did not include direct consumer sales, whether*

take a detailed examination of a company in exercising its authority to determine a "just and reasonable" rate for the transportation or sale of natural gas subject to its jurisdiction; (2) a natural gas company must obtain from FERC a "certificate of public convenience and necessity" before it constructs, extends, acquires, or operates any facility for the transportation or sale of natural gas in interstate commerce. FERC will grant the certificate only if it finds the company able and willing to undertake the project in compliance with the rules and regulations of the federal regulatory scheme. FERC may attach "to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require;" and (3) FERC has various powers and obligations that both allow and require it to protect against the deleterious effects of ill-considered or improper securities issuances in this area. *See Schneidewind,* 485 U.S. at 303–04, 108 S.Ct. 1145.

12. The Court stated: "By keeping a natural gas company from raising its equity levels above a certain point, Michigan seeks to ensure that the company will charge only what Michigan considers to be a 'reasonable rate.' This is regulation of rates." *Schneidewind,* 485 U.S. at 308, 108 S.Ct. 1145.

*for industrial or other uses. Those sales had been regulated by the states and the regulation had been repeatedly sustained. In no instance reaching this Court had it been stricken down.* Panhandle, 332 U.S. at 519, 68 S.Ct. 190 (emphasis added).

Medco relies heavily on the case of *Pacificorp v. Northwest Pipeline GP*, 2010 WL 3199950 (D.Or. June 23, 2010), a district court case that is not binding on this Court. In *Pacificorp*, Pacificorp was a utility company providing electricity to retail customers; it also owned a power plant in Oregon. Defendant Gas Transmission owned pipeline that delivered gas to the plant pursuant to a transportation agreement, and defendant Northwest Pipeline owned pipeline that interconnected with Gas Transmission's line. Pacific alleged Northwest Pipeline introduced lubricating oil into its pipeline system, which then flowed into Gas Transmissions's pipeline and caused damage to the power plant. It was alleged that Gas Transmissions controlled the gas pipeline that supplied gas to the power plant.

Pacificorp filed suit against, among others, Gas Transmission, alleging Gas Transmission breached both its duty and its contract, which required it to deliver gas that was commercially free from crude oil and other impurities. Although the contract in question did not specify a gas quality standard, it stated the agreement was subject to the applicable tariff filed with FERC. The tariff itself contained a section on gas quality, which required that the gas shipped and transported by Gas Transmission "shall be merchantable at all times complying with quality requirements" set forth in the tariffs, which required the gas to be commercially free from impurities. 2010 WL 3199950, *2.

In the lawsuit, Gas Transmission asserted complete federal preemption, arguing Pacificorp's claims were predicated on the FERC-filed tariff and on subject matter committed exclusively to federal jurisdiction. Pacificorp, however, contended it merely sought to enforce its private, state law contractual rights and the right to be free from negligence. After analyzing the NGA and its purpose,[13] the court conclud-

---

**13.** In *Pacificorp*, 2010 WL 3199950 *9, the court states the "primary aim of the Natural Gas Act 'was to address concerns about monopolization in the natural gas market,'" citing *E & J Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1036 (9th Cir.2007). However, this Court notes the actual language of the *Gallo* case, upon which the court in *Pacificorp* relies, is as follows:

> Congress originally gave FERC rate-setting jurisdiction over certain segments of the natural gas market to address concerns about monopolization in the natural gas market. Before Congress enacted the NGA, the natural gas market consisted of three segments: producers, interstate pipelines, and local distribution companies. Producers drilled for the natural gas at the wellhead and then sold the gas to interstate pipelines. Interstate pipelines then transported the gas to various locations throughout the country where it was purchased by local distribution companies, who, in turn, sold

the natural gas to consumers. As a result of their control over the transportation of natural gas, interstate pipelines developed monopoly power over both purchases of natural gas at the wellhead and sales to local distribution companies. *General Motors Corp. v. Tracy*, 519 U.S. 278, 283, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997).

*E & J Gallo*, 503 F.3d at 1036.

Indeed, in *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 610, 64 S.Ct. 281, 88 L.Ed. 333 (1944), the Supreme Court stated:

> We pointed out in *Illinois Natural Gas Co. v. Central Illinois Public Service Co.*, 314 U.S. 498, 506, 62 S.Ct. 384, 387, 86 L.Ed. 371 [(1942)], that the purpose of the Natural Gas Act was to provide, 'through the exercise of the national power over interstate commerce, an agency for regulating the wholesale distribution to public service companies of natural gas moving interstate, which this Court had declared to be interstate commerce not subject to certain types

ed the following:

> FERC's policy statement provides that "only natural gas quality ... specifications contained in a gas tariff can be enforced." FERC encourages pipelines and their customers to develop gas quality specifications, and to the extent that pipelines and their customers cannot resolve disputes over gas quality requirements, they can bring their disputes before FERC, "to be resolved on a case-by-case basis." The policy recognizes that the specifications must derive from the circumstances of each pipeline.
>
> *I conclude from the foregoing that Pacificorp's claims involve determinations of state law that do not intrude upon FERC's exclusive domain. While FERC has the authority to ensure the reasonableness of gas quality specifications contained in a FERC-filed tariff, nothing indicates that its exclusive authority extends to interpretation of contracts that incorporate such specifications.*
>
> Moreover, in the circumstances of this case, state contract law, which assures that parties to a contract receive the benefit of their bargain, does not serve

the same end as FERC's regulation of rates to protect consumers from monopolization. Pacificorp does not challenge rates but rather seeks to recover for damages to its facilities and production capacity arising out of Gas Transmission's alleged failure to deliver gas that met the contract's quality standards.

*Pacificorp*, 2010 WL 3199950 at *10 (emphasis added).

Thus, in *Pacificorp*, the court concluded even though FERC has the authority to ensure the reasonableness of gas quality specifications contained in a FERC-filed tariff, *where the parties agree to include those specifications in a contract*, a gas company can assert a state law claims for breach of contract against a pipeline company on issues related to the quality of the natural gas.[14] As expected, Medco relies heavily on the *Pacificorp* decision.

For its part, Sea Robin relies heavily on the Supreme Court's recent decision in *Kurns v. Railroad Friction Products Corp.*, — U.S. —; 132 S.Ct. 1261, — L.Ed.2d — (2012). Although not a case involving the NGA, the *Kurns* case is one of the Supreme Court's most recent—if not the most recent—detailed discussions

---

*of state regulation.'* As stated in the House Report the 'basic purpose' of this legislation was 'to occupy' the field in which such cases as *State of Missouri v. Kansas Natural Gas Co.*, 265 U.S. 298, 44 S.Ct. 544, 68 L.Ed. 1027 [(1924)], and *Public Utilities Commission v. Attleboro Steam & Electric Co.*, 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549 [(1927)], had held the States might not act. H.Rep. No. 709, 75th Cong., 1st Sess., p. 2. In accomplishing that purpose the bill was designed to take 'no authority from State commissions' and was 'so drawn as to complement and in no manner usurp State regulatory authority.' *Id.*, p. 2. And the Federal Power Commission was given no authority over the 'production or gathering of natural gas.' s1(b).

The primary aim of this legislation was to protect consumers against exploitation at the lands of natural gas companies....

Based upon the specific language of *E & J Gallo* and *Hope Natural Gas*, this Court concludes while the intent and purpose of Congress in *giving FERC rate-setting jurisdiction* over certain segments of the natural gas market might have been to address concerns about monopolization, the *overall purpose* of the NGA was to provide an agency for regulating the wholesale distribution of natural gas to public service companies and to protect consumers against exploitation at the hands of natural gas companies.

14. This Court notes it may, or may not, have decided the *Pacificorp* case in the same manner. Regardless, the *Pacificorp* case is not binding on this Court. The more recent Supreme Court decision in *Kurns v. Railroad Friction Products Corp.*, — U.S. —, 132 S.Ct. 1261, — L.Ed.2d — (2012), discussed above, is binding on this Court.

of the concept of field preemption vis-a-vis a federal regulatory scheme.

In *Kurns*, a former railroad employee and his wife brought a products liability action in state court against the manufacturer of asbestos brake pads and the successor in interest to the manufacturer of engine valves containing asbestos, alleging the employee's exposure to the manufacturers' products caused the employee to contract mesothelioma. The employee brought two state law claims: (1) defective design of certain locomotive parts, and (2) failure to warn the employee of the dangers associated with those parts. The issue before the Court was whether the plaintiffs' state law claims were preempted by the Locomotive Inspection Act ("LIA"), which requires, *inter alia*, that a "railroad carrier ... use ... a locomotive ... when the locomotive ... and its parts ... are in proper condition and safe to operate without unnecessary danger of personal injury...." 132 S.Ct. at 1265.

The Court noted the question before it was not presented in a vacuum. Indeed, the Supreme Court had earlier considered the preemptive effects of the LIA in the case entitled *Napier v. Atlantic Coast Line R. Co.*, 272 U.S. 605, 47 S.Ct. 207, 71 L.Ed. 432 (1926), in which the Court considered the railroad's challenge to two state laws that "prohibited the use within the State of locomotives not equipped" with certain prescribed devices, on grounds the Interstate Commerce Commissions (the agency then vested with the authority to carry out the LIA's requirements) had not required the devices in question, In *Napier*, the states had argued the requirements under the state laws were not preempted because they were directed at different objectives than the LIA, arguing while the state regulations were intended to protect railroad workers from sickness and diseases, the federal regulation was intended to prevent acci-

dental injury in the operation of trains. 132 S.Ct. at 1267–68.

In rejecting the state's arguments, the Court noted:

To determine whether the state requirements were pre-empted, this Court asked whether the LIA "manifest[s] the intention to occupy the entire field of regulating locomotive equipment[.]" The Court answered that question in the affirmative, stating that "[t]he broad scope of the authority conferred upon the [ICC]" by Congress in the LIA led to that conclusion. The power delegated to the ICC, the Court explained, was a "general one" that "extends to the design, the construction and the material of every part of the locomotive and tender and of all appurtenances."

*The Court rejected the States' contention that the scope of the pre-empted field was to "be determined by the object sought through the legislation, rather than the physical elements affected by it." The Court found it dispositive that "[t]he federal and the state statutes are directed to the same subject—the equipment of locomotives." Because the States' requirements operated upon the same physical elements as the LIA, the Court held that the state laws, "however commendable or however different their purpose," fell within the LIA's pre-empted field.*

*Kurns*, 132 S.Ct. at 1266, *citing Napier*, 272 U.S. at 611–13, 47 S.Ct. 207 (internal citations omitted) (emphasis added).

Applying the principles *of Napier* to the facts in *Kurns*, the *Kurns* Court noted:

In *Napier*, the Court held that Congress, in enacting the LIA, "manifest[ed] the intention to occupy the entire field of regulating locomotive equipment," and the Court did not distinguish between hazards arising from

repair and maintenance as opposed to those arising from use on the line. The pre-empted field as defined by *Napier* plainly encompasses the claims at issue here. **Petitioners' common-law claims for defective design and failure to .warn are aimed at the equipment of locomotives. Because those claims "are directed to the same subject" as the LIA,** *Napier* **dictates that they fall within the pre-empted field.** *Kurns,* 132 S.Ct at 1267, *citing Napier,* 272 U.S. at 611–12, 47 S.Ct. 207 (internal citations omitted) (emphasis added).

In *Kurns,* the petitioners argued the failure to warn claims were not preempted because "the basis for liability for failure to warn . . . is not the 'design' or 'manufacture' of a product, but is instead the failure to provide adequate warnings regarding the products' risks." *Id.* at 1268. The Court rejected this argument, reasoning:

> We disagree. A failure-to-warn claim alleges that the product itself is unlawfully dangerous unless accompanied by sufficient warnings or instructions. **Thus, the "gravamen" of petitioners' failure-to-warn claims "is still that [Corson] suffered harmful consequences as a result of his exposure to asbestos contained in locomotive parts and appurtenances." Because petitioners' failure-to-warn claims are therefore directed at the equipment of locomotives, they fall within the pre-empted field defined by** *Napier* . . . .

*Id.* (internal citations omitted) (emphasis added).

The Court also rejected the petitioner's argument that field preemption extends only to regulations and statutes, and not tort law duties and standards of care:

> Finally, petitioners contend that the LIA's pre-emptive scope does not extend to state common-law claims, as opposed to state legislation or regulation. Petitioners note that "a preempted field does not necessarily include state common law." *Napier,* however, held that the LIA "occup[ied] the entire field of regulating locomotive equipment" to the exclusion of state·regulation. **That categorical conclusion admits of no exception for state common-law duties and standards of care. As we have recognized, state "regulation can be . . . effectively exerted through an award of damages," and "[t]he obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." We therefore conclude that state common-law duties and standards of care directed to the subject of locomotive equipment are pre-empted by the LIA.**

*Kurns,* 132 S.Ct. at 1269 (internal citations omitted) (emphasis added).

In the instant case, Medco urges this Court to disregard the *Kurns* case, calling it "inapposite" on grounds any discussion of field preemption relies heavily on the intent of Congress with respect to a particular federal statutory scheme. Because *Kurns* involved the LIA and not the NGA, Medco argues the case provides little assistance when determining whether the state law claims in this case asserted are subsumed within the field of the NGA. While this Court agrees the analysis in the instant matter requires a careful analysis of the congressional intent behind the NGA, this Court is not persuaded the *Kurns* decision provides no guidance whatsoever simply because it involves a different federal regulatory scheme.

This Court's interpretation of the field preempted by the NGA is quite broad. The Supreme Court recognizes the NGA long has been recognized as a *"comprehensive scheme of federal regulation of 'all wholesales of natural gas in interstate commerce.'"* *Schneidewind,* 485 U.S. at

300, 108 S.Ct. 1145, citing *Northern Natural Gas Co. v. State Corporation Comm'n. of Kansas,* 372 U.S. 84, 91, 83 S.Ct. 646, 650–51, 9 L.Ed.2d 601 (1963), *quoting Phillips Petroleum Co. v. Wisconsin,* 347 U.S. 672, 682, 74 S.Ct. 794, 799, 98 L.Ed. 1035 (1954). The Supreme Court has noted in enacting the NGA, Congress drew "within its own regulatory power," the following areas: (1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transportation or sale.

In the instant case, plaintiff's claims for negligence, negligent misrepresentation, detrimental reliance, fraud, and violations of the LUTPA are all premised on the same facts, *i.e.,* that Sea Robin undertook certain duties to provide transportation service to Medco and that Medco sustained damages to its inability to transport gas through Sea Robin's pipeline system to its customers. Medco characterizes its claims as extra-contractual claims that seek to hold Sea Robin responsible for its own misrepresentations and negligence; Medco argues its claims do not seek to modify the tariff or other contracts between the parties in any way and do not implicate the NGA's anti-monopolization and anti-exploitation policies in any way.

Sea Robin, however, argues by permitting Medco to bring state law claims for negligence—which would seek to impose upon Sea Robin, a regulated carrier, certain state-created duties—imposes upon Sea Robin' the state's version of reasonable service requirements. Sea Robin argues the foregoing is precisely what Congress sought to foreclose by granting regulatory authority over Sea Robin to a federal agency (FERC). Sea Robin avers FERC regulates all matters related to the source of Medco's alleged injuries—*i.e.,* Medco's use of Sea Robin's transportation services—because Sea Robin is a natural gas company engaged in the transportation of natural gas subject to FERC jurisdiction. Sea Robin argues in making claims for damages against Sea Robin, Medco seeks to impose state regulations through state law duties and standards of care, in an area exclusively regulated by FERC.

Pursuant to the jurisprudence, this Court must look to *the physical elements* affected by the legislation in determining whether the state laws at issue are preempted by the federal regulatory scheme. Indeed, in *Kurns,* the Court rejected the States' contention that the scope of the preempted field was to "be determined by the object sought through the legislation, rather than the physical elements affected by it." *Kurns,* 132 S.Ct. at 1266, *citing Napier,* 272 U.S. at 611–13, 47 S.Ct. 207 (internal citations omitted). The Court noted:

> the "gravamen" of petitioners' failure-to-warn claims is still that [plaintiff] suffered harmful consequences as a result of his exposure to asbestos contained in locomotive parts and appurtenances.... Because petitioners' failure to warn claims are therefore directed at the equipment of locomotives, they fall within the preempted field defined by *Napier.*

*Kurns,* 132 S.Ct. at 1268.

Thus, the court found it dispositive that "[t]he federal and the state statutes are directed to the same subject—the equipment of locomotives." *Id.* Because the States' requirements operated upon the same *physical elements* as the LIA, the Court held the state laws, "however commendable or however different their purpose," fell within the LIA's pre-empted field. *Id.* at 1269.

In the instant case, Medco's state law claims seek damages for interruption to gas transportation services. Although

Medco couches its claims in terms of negligence—*i.e.*, negligence, negligent misrepresentation, and detrimental reliance, which is premised upon a duty—the *gravamen* of Medco's claims is that Sea Robin breached its contract to provide gas transmission services and failed to timely repair its pipeline in the wake of a hurricane so that gas transmission services were timely returned. Indeed, the damages Medco seeks are damages related to its inability to "market its production;" to "get its production to market in a timely manner;" and a reduction in the "marketable value" of its properties. In essence, Medco asserts Sea Robin owes lost revenue and/or business interruption damages due to the damage sustained to Sea Robin's pipeline. However, within the NGA, Congress drew within its regulatory power (1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transportation or sale. Therefore, despite couching its claims in terms of negligent conduct in the part of Sea Robin, the *gravamen* of the claims asserted by Medco are for business damages associated with Medco's inability to sell production, which is the subject of the tariff and such inability allegedly was occasioned by Sea Robin's failure to timely provide gas transportation. Although the purposes of Louisiana negligence laws and standards of care might serve a purpose other than that articulated by the NGA—*i.e.*, the regulation of all wholesales of natural gas in interstate commerce, a zone Congress has determined is "in the public interest"—this Court concludes because the state law tort claims alleged by Medco against Sea Robin operate upon the same *physical elements* as the NGA—*i.e.*, the transmission of gas by a pipeline company, whether timely or not—Medco's state law tort claims fall within the NGA's pre-empted field. This Court notes, however, the question at issue as well as the jurispru-

dence is not as clear as one might desire, and this Court recognizes the opposing argument is not without merit. However, considering existing jurisprudence, this Court finds the stronger argument supports the finding that the field is preempted.

### B. Filed Rate Doctrine

■ Out of an abundance of caution and given the uncertainty within the area of law, and as an alternative grounds for dismissing Medco's claims as preempted, this Court will, also, address Sea Robin's argument that Medco's claims are preempted by the filed rate doctrine. Concluding that Medco's claims are so preempted, this Court finds as follows.

■ The filed rate doctrine applies by virtue of the Supremacy Clause and bars claims that conflict with a tariff, or would vary or enlarge a party's rights as defined by a tariff. The Supreme Court's treatment of the filed rate doctrine in *Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998) ("*AT & T*") is instructive, and has been noted by the Fifth Circuit to be "the leading and controlling case in this area." *See Access Telecom, Inc. v. MCI Telecommunications Corp.*, 197 F.3d 694, 711 (5th Cir.1999), *citing Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998).

The *AT & T* case involved preemption under the Communications Act, 47 U.S.C. § 203, *et seq.* AT & T, the long-distance telephone company, is a common carrier under the Act and must observe certain requirements imposed by that law. Among other things, the Act requires that common carrier file "schedules," also known as "tariffs," containing all of their charges for interstate service and "all classifications, practices, and regulations affecting such charges." The Federal Communications Commission (FCC), the

agency responsible for enforcing the Act, requires carriers to sell long-distance services to resellers such as the respondent, COT, under the same rates, terms, and conditions as apply to other customers. 524 U.S. at 217, 118 S.Ct. 1956.

In the 1980's, AT & T developed a type of long-distance service that COT wished to purchase and resell. In October 1989, COT contacted AT & T about purchasing the service, and discussed the proposed purchase with an AT & T sales representative, who indicated if COT purchased the service, certain installation charges would be waived and COT would receive a discount off the basic rates in exchange for a 4-year commitment to purchase. *Id.* at 218, 118 S.Ct. 1956. AT & T also sent certain brochures describing the service to COT. AT & T confirmed COT's order would be "pursuant to the rates, terms and conditions in AT & T's tariff, and the provisions of the tariff including limitations on AT & T liabilities, shall govern the parties' obligations and liabilities with respect to the service and options you have selected." *Id.* at 219, 118 S.Ct. 1956. COT accepted these terms in writing on October 30, 1989.

Thereafter, COT began experiencing problems with the network, including delays in the filling of orders and in billing. In September 1992, COT informed AT & T it was terminating its service with 18 months remaining on its contract. *Id.* at 220, 118 S.Ct. 1956.

Meanwhile, COT had filed suit against AT & T in federal district court. Although AT & T argued throughout the pendency of the lawsuit that COT's state-law contract and tort claims were pre-empted by the filed tariff requirements of § 203 of the Act, the magistrate judge rejected such argument, and two state law claims went to trial: (1) breach of contract, including breach of an implied covenant of good faith and fair dealing; and (2) tortious interference with contractual relations vis-a-vis COT's contracts with its customers. The court characterized COT's claims in the following manner:

[COT's] state-law claims rested on the allegation that its contracts with [AT & T] were not limited by [AT & T's] tariff but also included certain understandings [COT's] president derived from reading [AT & T's] brochures and talking with its representatives. According to [COT], [AT & T] promised various service, provisioning, and billing options in addition to those set forth in the tariff. [COT] also claimed that [AT & T] violated its state-law implied duty of good faith and fair dealing by taking actions that undermined the purpose of the contract for [COT], which was to purchase SDN services for resale at a profit. *The tortious-interference claim was derivative of the contract claim. [COT] asserted that, because [COT] promised certain benefits of SDN to its customers, and because [AT & T] provided competing services, any intentional violation of [AT & T] contractual duties constituted tortious interference with [COT's] relationship with its customers.* [COT] also asserted that, since [AT & T's] conduct was willful, consequential damages were available under the terms of the tariff. [AT & T] filed a counterclaim to recover $200,000 in unpaid tariffed charges from April to October 1990, and to obtain the termination charges that [COT] did not pay in 1992. Throughout the proceedings in District Court, [AT & T] argued that [COT's] state-law contract and tort claims were preempted by the filed tariff requirements of § 203 of the Act. The Magistrate Judge rejected this argument and instructed the jury to consider not only the written subscription agreements, but also any statements made or documents furnished before the parties signed the agreements "if you find that the parties

intended that those statements or written materials form part of their agreements."

*Id.* at 220–21, 118 S.Ct. 1956 (emphasis added).

After a full jury trial, the jury found for COT on its state law claims and awarded COT $13 million in lost profits. The magistrate judge reduced the amount and, on appeal, the Ninth Circuit affirmed the underlying judgment, but reversed and remanded to the magistrate judge on an issue related to punitive damages. *Id.* at 221, 118 S.Ct. 1956. The Supreme Court granted certiorari solely to determine whether the filed rate requirements of the Communications Act preempted COT's state law claims, a contention AT & T had made throughout the case.

On appeal, the Supreme Court noted the Communications Act required AT & T to filed with the FCC its tariff schedules, showing all charges, classifications, practices and regulations affecting such charges. Commenting on the Ninth Circuit's ruling, the Supreme Court noted:

> The Ninth Circuit thought the filed rate doctrine inapplicable "[b]ecause this case does not involve rates or ratesetting, but rather involves the provisioning of services and billing." ***Rates, however, do not exist in isolation. They have meaning only when one knows the services to which they are attached. Any claim for excessive rates can be couched as a claim for inadequate services and vice versa.*** "If 'discrimination in charges' does not include nonprice features, then the carrier could defeat the broad purpose of the statute by the simple expedient of providing an additional benefit at no additional charge.... An unreasonable 'discrimi-

nation in charges,' that is, can come in the form of a lower price for an equivalent service or in the form of an enhanced service for an equivalent price." The Communications Act recognizes this when it requires the filed tariff to show not only "charges," but also "the classifications, practices, and regulations affecting such charges," and when it makes it unlawful to "extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges" except those set forth in the tariff.

*Id.* at 223, 118 S.Ct. 1956 (internal citations omitted) (emphasis added).

Concluding COT's claims sought privileges that were not included in AT & T's tariff—despite the fact that COT argued AT & T had *intentionally misrepresented* the benefits COT would obtain if it purchased the long-distance service—the Supreme Court concluded COT's state law claims were barred by the filed rate doctrine. With respect to COT's tortious interference claim, the Court concluded this claim was wholly derivative of COT's breach of contract claim. Emphasizing *the rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier,* the Court concluded COT's tort claim "stem[med] from the alleged failure of AT & T to comply with its contractual relationship" with COT. Thus, the Supreme Court concluded COT's tort claim was also barred by the filed rate doctrine. *Id.* at 227–28, 118 S.Ct. 1956.

█ The filed rate doctrine applies to natural gas tariffs filed with FERC, *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 577, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981),[15] and, like the Communications

**15.** The *Arkansas* court stated: "Sections 4(c) and 4(d) of the Natural Gas Act, 52 Stat. 822–823, 15 U.S.C. §§ 717c(c) and 717c(d), require sellers of natural gas in interstate com-

merce to file their rates with the Commission. Under § 4(a) of the Act, 52 Stat. 822, 15 U.S.C. § 717c(a), the rates that a regulated gas company files with the Commission for

Act, does not apply solely to rates, but also to the "rules and regulations affecting or pertaining to such rates or charges." *See* 15 U.S.C. 717c.[16] In clear cut cases where the plaintiff's state law claims evidence a challenge to the *terms of a filed tariff,* the result is relatively simple: The filed rate doctrine bars the plaintiff's state law claims. However, as the Eleventh Circuit stated in *Hill v. BellSouth Telecommunications, Inc.,* 364 F.3d 1308, 1315 (11th Cir.2004):

> A more difficult question is presented .... when the plaintiff's claims—at least on their face—do not attempt to challenge a filed rate and thus do not appear to implicate the parties' rights and liabilities under that rate.

(internal citations omitted).

Such a question is presented in the instant case. Medco argues it does not challenge the rates, *per se,* contained within Sea Robin's tariff, as follows:

> In this case, Medco, is not asking to enforce any deal it had with Sea Robin to ship (or not ship) Medco's gas. Sea Robin had a damaged pipeline and could

not ship anyone's gas. Medco is thus similarly situated with the entire public at large. Accordingly, there is no issue with Medco receiving any "special deal," and Sea Robin's tariff—which only regulates the shipping of gas—is inapplicable here. Instead, Medco is suing Sea Robin for misrepresenting to Medco when Sea Robin would be ready to resume transportation to its pipeline.[17]

Despite Medco's arguments, courts in other circuits have concluded a claim for compensatory damages may implicate the filed rate doctrine not only where it expressly challenges a rate, but where it has the *effect* of challenging the filed rate. For example, in *Marcus v. AT & T Corp.,* 938 F.Supp. 1158 (S.D.N.Y.1996), *aff'd,* 138 F.3d 46 (2nd Cir.1998), *the gravamen of the plaintiffs' claims was that AT & T deceived its customers by failing to disclose residential service customers are billed per minute rounded up to the next higher full minute for long distance service.* That billing practice did not appear on AT & T bills or on any other materials sent to customers, but did appear in tariffs

---

sale and transportation of natural gas are lawful only if they are "just and reasonable." No court may substitute its own judgment on reasonableness for the judgment of the Commission. The authority to decide whether the rates are reasonable is vested by § 4 of the Act solely in the Commission, and "the right to a reasonable rate is the right to the rate which the Commission files or fixes[.]" Except when the Commission permits a waiver, no regulated seller of natural gas may collect a rate other than the one filed with the Commission. These straightforward principles underlie the "filed rate doctrine," which forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority. The filed rate doctrine has its origins in this Court's cases interpreting the Interstate Commerce Act, and has been extended across the spectrum of regulated utilities. "The considerations underlying the doctrine ... are preservation of the agency's primary jurisdiction

over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has been made cognizant." " 453 U.S. at 577–78, 101 S.Ct. 2925 (internal citations omitted).

**16.** Section 717c(a) states:

(a) Just and reasonable rates and charges All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful.
15 U.S.C. § 717c(a).

**17.** *See* Medco's Opposition to Sea Robin's Motion for Summary Judgment, Doc. 85, at p. 17.

filed with the FCC. Plaintiffs filed suit against AT & T alleging claims for deceptive acts and practices, false advertising, fraud and deceit, negligent misrepresentation, breach of warranty, and unjust enrichment, essentially challenging AT & T non-disclosure of the billing policy. AT & T argued the filed rate doctrine barred all claims, and the district court agreed. The Second Circuit affirmed. In ruling for AT & T, the court rejected plaintiffs' argument that their claims did not engage the filed rate doctrine because they attacked AT & T's *non-disclosure of its residential long distance rates* rather than the *reasonableness of those rates,* noting the filed rate doctrine "applies as stringently to claims challenging the individual application of the filed rate, as it does to claims challenging the general integrity of that rate." 938 F.Supp. at 1170.

The court also rejected plaintiffs' argument that their claims should proceed because they alleged a fraud on the public, explaining:

> **As long as the carrier has charged and the plaintiff has paid the filed rate, what bars a claim is not the harm alleged,** but the impact of the remedy sought *Any remedy that requires a refund of a portion of the filed rate— whether an award of damages for fraud on an agency or an award of damages for fraud on consumers—is barred.*

*Id.* at 1170. *See also Evanns v. AT & T Corp.,* 229 F.3d 837 (9th Cir.2000) (where plaintiff challenged AT & T's non-disclosure of its collection of certain pass-through charges which were not required by regulation, court held where AT & T had filed its tariff with the FCC, any claim that AT & T had an obligation to plaintiff "beyond those set out in the filed tariffs, *i.e.,* that [AT & T] had a duty to disclose the fact that the USF assessment was a pass-through charge, is ... barred by the filed-rate doctrine."); *Hill v. BellSouth Telecommunications, Inc.,* 364 F.3d 1308, 1315 (11th Cir.2004) (concluding plaintiff's state law claims, which sought monetary damages for certain undisclosed charges, implicated the filed rate doctrine, noting "even if a claim does not directly attack the filed rate, an award of damages to the customer that would, in effect, result in a judicial determination of the reasonableness of that rate is prohibited under the filed rate doctrine.").

The Fifth Circuit touched on the issue in *Access Telecom, Inc. v. MCI Telecommunications Corp.,* 197 F.3d 694 (5th Cir. 1999). In *Access Telecom,* an American telephone company, ATI, a telephone company based in Texas, exported U.S. phone services to customers in Mexico. 197 F.3d at 701. "These services allowed Mexican customers to place U.S.-based phone calls directly from Mexico. Customers first called ATI in Texas and then entered the new phone number they wanted to call. ATI dialed that new number from the U.S. and effectively spliced the customer's first call to the new call, enabling the customer to communicate with the new destination. As a result, each call had two legs: the Mexican leg from Mexico to Texas and the U.S. leg from Texas to the final destination. The benefit to ATI's customers from this arrangement was that the cost of the two-legged call was less than the cost of a normal call from Mexico through Teléfonos de México (Telmex)." *Id.*

The Mexican leg of each call was carried on toll free numbers that ATI received from MCI, which leased the numbers for these lines from Telmex. ATI's contracts with MCI incorporated the terms and conditions of MCI's U.S. filed tariffs. Although Mexican law required a permit to be a provider of telecommunications services in Mexico, ATI never obtained one. Consequently, Telmex discontinued ATI's

800 numbers, which ultimately destroyed ATI's business. *Id.* at 702.

Thereafter, MCI began arbitration proceedings to recover payment of ATI's phone bill. ATI then sued MCI, Telmex and others in Texas state court, alleging claims for breach of contract, tortious interference with contract, negligent misrepresentation, promissory estoppel (detrimental reliance), and federal and state antitrust violations. The case was removed to federal district court, and MCI moved for summary judgment on grounds all of ATI's state law claims were preempted. *Id.* at 703.

The district court held the filed rate doctrine barred ATI's claims for negligent misrepresentation and breach of contract.[18] *Id.* at 703. On appeal, the Fifth Circuit distinguished the holding of *AT & T*— which had held the filed rate doctrine barred COT's tortious interference claims against AT & T on grounds the tort claims were derivative of COT's breach of contract claim—as follows:

> ATI's tortious interference claims are different. It does not allege that MCI stopped providing service, resulting in ATI being unable to meet customer demand. Rather, ATI alleges that MCI released confidential information, first to Telmex and then to AT & T. This information ultimately led those parties to deny service to ATI. *This claim is not derivative of a contract claim. It does not concern the provision of services which are covered by the filed tariff, but rather it concerns illegal actions outside the scope of the tariff and not derivative of any phone services. Therefore, the filed rate doctrine does not preempt ATI's tortious interference claims.*

*Id.* at 711 (emphasis added).

Like the plaintiff in *AT & T*, Medco's state law claims rest on allegations that its relationship with Sea Robin is not limited by Sea Robin's tariff, but also includes extra-contractual obligations or duties arising because of certain representations Sea Robin made after Hurricane Ike, namely, that Sea Robin was undertaking repairs to its pipeline, was repairing the damaged pipeline within a certain time frame, and would return the pipeline to service within a certain time frame. Medco argues once Sea Robin made those representations, the representations created new duties and obligations on the part of Sea Robin with respect to the provision of gas transmission services. Although Medco attempts to skirt the issue of the existence of the filed tariff in this case by couching its claims in terms of *torts*—and not breach of contract—the tort claims for negligence, negligent misrepresentation, detrimental reliance, fraud and violations of LUTPA are actually derivative of the obligations imposed on Sea Robin by its tariff, which governs the relationship between the parties.

The Supreme Court in *AT & T*, however, did not allow such claims, noting *the rights as defined by [a] tariff cannot be varied or enlarged by either contract or tort of the carrier,* and concluding where the plaintiff's tort claim "stem[med] from the alleged failure of AT & T to comply with its contractual relationship," such claim was barred by the filed rate doctrine. *Id.* at 227–28, 118 S.Ct. 1956. *AT & T*, 524 U.S. at 227–28, 118 S.Ct. 1956.

---

18. The district court also granted summary judgment in favor of MCI on the promissory estoppel claim, holding ATI could not justifiably rely on MCI's representations concerning issues of Mexican law, and granted summary judgment in favor of MCI on ATI's claim for tortious interference with contracts, concluding such claim was essentially a breach of contract claim that was barred by the limitation of liability provisions in MCI's tariff. *Access Telecom*, 197 F.3d at 703.

Again, Medco has not alleged a breach of contract claim. However, this Court notes the strong argument that Medco should not be allowed to skirt the issue by not alleging a breach of contract claim, but rather alleging claims that would be derivative of a breach of contract claim, had one been pled. Medco's tort claims stem from Sea Robin's alleged failure to comply with certain extra-contractual duties and obligations Medco argues existed because of certain representations made by Sea Robin. Similarly, in *Marcus*, the plaintiffs did not allege a breach of contract claim, but rather, couched all of their claims in tort, arguing AT & T deceived its customers by failing to disclose certain billing practices.[19] The Marcus court barred plaintiffs' claims, explaining:

> **As long as the carrier has charged and the plaintiff has paid the filed rate, what bars a claim is not the harm alleged,** but the impact of the remedy sought *Any remedy that requires a refund of a portion of the filed rate— whether an award of damages for fraud on an agency or an award of damages for fraud on consumers—is barred.*

*Id.* at 1170 (emphasis added).

In the instant case, Medco seeks damages related to its inability to "market its production;" to "get its production to market in a timely manner;" and a reduction in the "marketable value" of its properties. The nature of Medco's claimed damages are, that it wishes to be made whole, which would essentially alter the rate charged by Sea Robin under its tariff; any damages awarded to Medco would result in a refund of a portion of the filed rate. It would seem, such damage awards are barred by well-settled jurisprudence.

The Court is mindful of the Fifth Circuit's ruling in *Access Telecom;* however, this Court believes the instant case is distinguishable from *Access Telecom.* In *Access Telecom,* the Fifth Circuit determined the plaintiff's state law claims for tortious interference were not derivative of a breach of contract claim because the claim *did not implicate the service provided by MCI.* As the court stated: "[Plaintiff's tort claim] does not concern the provision of services which are covered by the filed tariff, but rather it concerns illegal actions outside the scope of the tariff and not derivative of any phone services. Therefore, the filed rate doctrine does not preempt ATI's tortious interference claims." 197 F.3d at 711.

In the instant case, however, Medco's claims implicate the service of Sea Robin and is clearly derivative of those services. Indeed, Medco seeks to be made whole for its inability to sell any production from EC317 and 318 since Hurricane Ike and its inability to sell production from EC316 since its purchase in February 2009. Thus, the remedy sought by Medco is its lost profits during that time period, occasioned by Sea Robin's alleged failure to provide gas transmission services, and those services are the subject of "tariff" in this matter. The fact that Medco couches its claims in terms of what Sea Robin promised or did not promise about the services, which are the subject of the "tariff", does not inactivate the bar of the filed rate doctrine, so to speak. Because the remedy sought herein would effectively refund a portion of the filed rate, and thus, would have clear impact on the amounts paid under the "tariff," Medco's tort claims seeking such remedy are barred.

Considering the foregoing, this Court concludes Medco's state law claims for

---

**19.** The claims alleged by the plaintiff in *Marcus* are strikingly similar to those alleged by Medco herein, *i.e.,* deceptive acts and practices, false advertising, fraud and deceit, negligent misrepresentation, breach of warranty, and unjust enrichment.

negligence, negligent misrepresentation, detrimental reliance, fraud and violations of the LUTPA are barred by the filed rate doctrine.[20]

## III. Conclusion

For the foregoing reasons, IT IS ORDERED that Sea Robin's Motion for Summary Judgment on Preemption Grounds [Doc. 81] is GRANTED, and Medco's claims against Sea Robin are DENIED AND DISMISSED WITH PREJUDICE as preempted by federal law. Sea Robin's Motion for Summary Judgment on State Law Grounds [Doc. 80] is DENIED as moot.

This Court believes the foregoing ruling is dispositive of all claims brought in the instant case. Therefore, the parties shall submit a final judgment, approved as to form, within ten days of the date of this Ruling.

**20.** Because this Court concludes Sea Robin's claims are barred by the doctrines of field preemption and/or the filed rate doctrine, this Court need not consider the final, narrow ground Medco alleges in its motion, *i.e.*, that Sea Robin's negligence claim is barred by prior FERC proceedings.